COMMERCIAL LUBRICANTS, LLC,

Plaintiff,

vs.

SAFETY-KLEEN SYSTEMS, INC.,

Defendant.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF
NEW YORK

Case Action No. 1:14-cv-07483-MKB-RLM

Hon. Margo K. Brodie

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE COMPLAINT

---

RIKER DANZIG SCHERER HYLAND &
   PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

Federal Bar No. (SR-9021)

Attorneys for Plaintiff,
Commercial Lubricants, LLC

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS ..........................................................................................2

     A.    SK's Abrupt And Improper Termination Of Waste Oil Payments To CL .............5

     B.    SK's Improper Billing of CL and Refusal to Honor Prior Agreements .................7

     C.    SK'S Breach of the Agreement to Provide CL With Exclusive Price Support .....13

LEGAL ARGUMENT...............................................................................................13

POINT I ...............................................................................................................13

     THE EXISTENCE OF DISPUTED MATERIAL FACTS
     COMPELS THE DENIAL OF SUMMARY JUDGMENT AS TO
     COUNTS I, II, V AND VI OF THE COMPLAINT...........................................13

POINT II ..............................................................................................................15

     SK IN NOT ENTITLED TO SUMMARY JUDGMENT ON
     COUNT VII (PROMISSORY ESTOPPEL) OF THE AMENDED
     COMPLAINT BECAUSE CL IS ENTITLED TO DAMAGES IN
     CONNECTION WITH THIS CLAIM ............................................................15

POINT III.............................................................................................................19

     CL HAS ESTABLISHED A *PRIMA FACIE* CASE OF FRAUD
     (COUNT IX)..............................................................................................19

POINT IV.............................................................................................................21

     CL HAS ESTABLISHED CLAIMS FOR TORTIOUS
     INTERFERENCE WITH CONTRACT (COUNT X) AND
     PROSPECTIVE ECONOMIC ADVANTAGE (COUNT XI)........................21

POINT V ..............................................................................................................22

     SK IS NOT ENTITLED TO SUMMARY JUDGMENT ON
     COUNT XII (DECLARATORY JUDGMENT), WHICH MUST
     BE ADJUDICATED TO DETERMINE THE PARTIES'
     OBLIGATIONS TO ONE ANOTHER ..........................................................22

POINT VI.............................................................................................................23

SK HAS WAIVED ITS RIGHT TO ARBITRATE THE CLAIM
BROUGHT IN COUNT XIII OF THE AMENDED COMPLAINT ................................23

CONCLUSION..............................................................................................................25

12/14/16

# TABLE OF AUTHORITIES

Page(s)

CASES

Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,
    98 F.3d 13 (2d Cir. 1996)..................................................................................19

Brookridge Funding Corp. v. Northwestern Human Resources,
    170 Fed. Appx. 170 (2d Cir. 2006)..................................................................18

Childers v. New York & Presbyterian Hosp.,
    36 F.Supp.3d 292, 309 (S.D.N.Y. 2014) .....................................................19, 10

Clifford R. Gray, Inc. v. LeChase Const. Servs.,
    51 A.D.3d 1169, 857 N.Y.S.2d 347 (2008) ....................................................18

Cohen v. Koenig,
    25 F.3d 1168 (2d Cir. 1994)............................................................................19

Cyberchron Corp. v. Calldata Sys. Dev. Inc.,
    47 F.3d 39 (2d Cir. 1995).............................................................................15, 16

Dawson Home Fashions, Inc. v. SRCO Inc.,
    94-cv-6333, 1995 WL 679253 (S.D.N.Y. Nov. 15, 1995) ...........................23

De Sapio v. Kohlmeyer,
    321 N.E.2d 770, 362 N.Y.S.2d 843 (1974).....................................................24

Dow Jones & Co., Inc. v. Harrods, Ltd.,
    237 F.Supp.2d 394 (S.D.N.Y. 2002)...............................................................23

Forbo-Giubiasco, S.A. v. Congoleum Corp.,
    78-cv-5390 (S.D.N.Y. Oct. 17, 1984)..............................................................23

Gold Medal Farms, Inc. v. Rutland Cty. Co-op. Creamery, Inc.,
    9 A.D.2d 473 (1959) .......................................................................................21

Golden Budha Corp. v. Canadian Land Co. of Am., N.V.,
    931 F.2d 196 (2d Cir. 1991).............................................................................20

In re Combustible Equip. Assoc.,
    838 F.2d 35 (2d Cir.1988)................................................................................22

Joseph Victori Whines, Inc. v. Vina Santa Carolina, S.A.,
    933 F. Supp. 347 (S.D.N.Y. 1996) .................................................................23

12/14/16

Katzman v. Helen of Troy Texas Corp.,
    12-cv-4220, 2013 WL 325562 (S.D.N.Y. Jan. 28, 2013) .......................................................23

KNK Enters., Inc. v. Harriman Enters., Inc.,
    33 A.D.3d 872, 824 N.Y.S.2d 307 (2d Dep't 2006)...................................................19

Knudsen v. Quebecor Printing (U.S.A.) Inc.,
    792 F. Supp. 234 (S.D.N.Y.1992) ...........................................................16

Lightning Lube, Inc. v. WITCO Corp.,
    4 F.3d 1153 (3d Cir. 1993)...........................................................17

Luckenbach Steamship Co. v. United States,
    312 F.2d 545 (2d Cir.1963)...........................................................22

Merex A.G. v. Fairchild Weston Sys., Inc.,
    29 F.3d 821 (2d Cir. 1994)...........................................................18

Multi-Justice, S.A. v. Snapple Beverage Corp.,
    No. 02-cv-4635, 2006 WL 2683429 (S.D.N.Y. Sept. 18, 2006) ..........................15, 16

Nishio v, E.F. Hutton & Co., Inc.,
    168 A.D.2d 224, 562 N.Y.S.2d 112 (1st Dept. 1990)...........................................24

RLS Associ., LLC v. United Bank of Kuwait PLC,
    380 F.3d 704 (2d Cir. 2004)...........................................................15

Seiden Assoc., Inc. v. ANC Holdings, Inc.,
    754 F. Supp. 37 (S.D.N.Y.1991) .......................................................16

Sofi Classic S.A. de C.V. v. Hurowitz,
    444 F. Supp. 2d 231 (S.D.N.Y. 2006)...................................................19

State of N.Y. v. N. Storonske Cooperage Co.,
    174 B.R. 366 (N.D.N.Y. 1994) ........................................................20

Structured Capital Sols. v. Commerzbank AG,
    177 F. Supp. 3d 816, 836 (S.D.N.Y. 2016)...........................................19

Von Der Ruhr v. Immtech Corp.,
    570 F.3d 858 (7th Cir. 2009) .........................................................17

Zhao v. State University of N.Y.,
    472 F.Supp.2d 289 (E.D.N.Y. 2007) .................................................15

**STATUTES**

28 U.S.C. § 2201(a) ...........................................................22

iv

**RULES**

F.R.C.P. 8(d)(2) ..................................................................................................................16

F.R.C.P. 34 ..........................................................................................................................6

F.R.C.P. 8(e)(2) ..................................................................................................................16

F.R.E. 701 ..........................................................................................................................17

Federal Rule of Civil Procedure 57 .................................................................................22

12/14/16

## PRELIMINARY STATEMENT

Plaintiff, Commercial Lubricants, LLC ("Plaintiff" or "CL") submits this Memorandum of Law in Opposition to the Motion for Partial Summary Judgment filed by defendant-counterclaimant, Safety-Kleen Systems, Inc. ("Defendant" or "SK") to dismiss Counts I, II, V, VI, VII, VII, IX, X, XI, XII and XIII of the Amended Complaint ("Complaint") filed on August 31, 2015 (the "Motion").

SK's Motion must be denied due to a multitude of disputed material facts, which cannot be resolved in connection with this Motion. For example, CL is not entitled to summary judgment on Counts I, II, V and VI, which arise from a promise by SK to provide CL with a $.15 per gallon credit if CL used its contacts at the MTA to discuss using a certain additive preferred by SK. CL satisfied its obligation by convincing the MTA to consider using the additive, thereby precluding entry of summary judgment in favor of SK on these counts of the Complaint.

Similarly, SK is not entitled to the dismissal of CL's tortious interference and fraud claims. CL has established a *prima facie* case that, through a series of knowingly false representations, CL relied to its detriment on SK's active encouragement to make investments in its operations in furtherance of what SK called their "strategic partnership," which also included CL receiving, *inter alia*, "exclusive price support" and the benefit of persuading the MTA to accept SK's preferred additive. Unknown to CL, however, senior executives within SK were actively plotting to take action in direct contravention of nearly simultaneous representations and promises, which resulted in substantial harm to CL through the loss of customers, future business opportunities and false pricing that, to this day, SK refuses to correct.

Finally, SK is not entitled to summary judgment on CL's claims for declaratory judgment and breach of the Waste Oil Agreement. A declaratory judgment is necessary to

finally determine the amounts due and owing between CL and SK.  And SK's eleventh-hour attempt to invoke an arbitration clause contained in the Waste Oil Agreement -- after taking full advantage of the discovery process available in this Court -- is meritless and an obvious attempt to avoid paying CL approximately $1 million in damages for waste oil surreptitiously collected from CL's customers after the commencement of this action.

For the foregoing reasons and the reasons that follow, CL respectfully requests that the Court deny SK's Motion, with the exception that CL consents to the voluntary dismissal of Count VIII (Equitable Estoppel).

## STATEMENT OF FACTS

Commercial Lubricants, LLC ("CL") purchased the assets of New York Commercial Lubricants ("NYCL") in 2013 based in large part on NYCL's strategic relationship with SK. Prior to closing the sale, CL's Managing Member, Gary Stetz, had conversations with SK representatives about the "strategic partnership" existing between the two companies and the potential for future growth opportunities.  (Declaration of Scott E. Reynolds, dated December 14, 2016 ("Reynolds Decl."), Ex. A at Ex. A thereto, 1-2).  Pursuant to the "strategic partnership," SK granted CL with "exclusive price support" (*i.e.*, preferred pricing) in connection with the distribution of SK Natural Gas Engine Oil ("NGEO") to the New York City Department of General Services and its agencies ("NYC"), which included the Metropolitan Transportation Agency ("MTA").  Maintaining the MTA business was critical to SK.  Although supplying NGEO to the MTA did not have the margins that SK preferred, it was important to maintain the business, which it considered a "jewel in its ring," for several reasons.  (Reynolds Decl., Ex. B at Tr. 17:12-18:4).  First, the MTA was a high-profile account used by SK to market its products to other customers, including large transportation agencies.  Second, SK was eager to convince the MTA to switch from using the low-margin, NGEO with a lubrizol additive ("CJ-4+Lubrizol") to

2

the higher-margin, NGEO with an infineum additive ("CJ-4+Infineum").  Such a switch by the MTA would increase the profitability of supplying the MTA with NGEO.

For its part, CL was willing to make the investment in its operations required to supply the MTA with SK's products knowing that it would receive a return on its investment by SK's guarantee that CL would receive "exclusive pricing" on all NGEO sold to NYC.  With SK's guarantee in hand, CL invested in its operations in an attempt to maintain the MTA account, and ensure that it would enjoy "exclusive price support" on any (higher-margin) CJ-4+Infineum supplied to the MTA.  (Affidavit of Gary Stetz, dated December 14, 2016 ("Stetz Aff."), ¶13).

The agreement to provide exclusive price support to CL cannot be denied by SK.  In a September 23, 2013 email in which Mr. Stetz confirms the exclusivity arrangement, Mr. Knapp assures him by responding "we can make that happen[.]"  (Reynolds Decl., C at SK01114).  Two days later, during a September 25, 2013 telephone conference, Mr. Knapp assured Mr. Stetz that SK would <u>not</u> provide price support on New York City bids to Circle Lubricant, Inc. (CL's direct competitor) because NYCL had spent significant resources in maintaining the MTA business over the years.  (Reynolds Decl., Ex. D).

In furtherance of these discussions with SK, Mr. Stetz and his team drafted the 2013-14 Metrolube Sales and Marketing Plan ("MSMP"), which documented CL's long-term partnership goals and growth strategy.  The MSMP was shared and discussed with SK.  (Reynolds Decl., Ex. E).  Notably, through the MSMP, CL clearly informed SK that one of its main objectives was to "[g]row branded sales of EcoPower [SK's brand,] increasing brand presence and market value and achieve top 5 Safety-Kleen distributor ranking in the US[,]" and "[i]ncrease collections and services at existing Metrolube lubes customers from 500K gallons to 2,000K gallons <u>over the</u>

next 5 years." (Id.) (emphasis added).  As such, CL clearly intended to continue a long-term partnership with SK, and shared its goals and operational investment with SK.

By all external indications, SK was in agreement with CL's plans and actively encouraged CL to expand its operations to supply the volume of product SK anticipated it would distribute.  For example, on September 9, 2013, Mr. Lewis followed up with CL, stating "[w]e will need to set up a time to meet and implement marketing strategies, which you had outlined." (Reynolds Decl., Ex. F at SK01101-02).  Further, that same day, Mr. Knapp called CL to inform its representatives that he liked and approved of the MSMP.  Thereafter, on September 25, 2013, Mr. Knapp emailed Mr. Stetz encouraging CL to move forward with its growth plans, noting that SK "see[s] the potential to add further value to each other's business by working together in a very focused way to leverage unique assets each company can bring to the party."  (Reynolds Decl., Ex. G at SK0117).

Having received the positive feedback, CL continued to spend significant time, money and energy researching business opportunities, developing strategy, and training sales staff. (Stetz Aff., ¶13).  In order to ensure the success of the strategic partnership, SK agreed to extend CL a credit line in the amount of $750,000.  (Reynolds Decl., Ex. H).

In early 2013, Clean Harbors acquired SK.  (Reynolds Decl., Ex. I).  The acquisition of SK by Clean Harbors was the triggering point for the claims that give rise to this action.

Notwithstanding the positive representations SK representatives made to CL, it is now clear that SK had very different intentions regarding its relationship with CL.  On October 10, 2013, despite the numerous meetings, encouragement and positive conversations with Mr. Stetz, Mike Smith, SK's newly hired Executive Vice President of Sales and Marketing, was internally warning SK employees to be careful what information they share with CL, and that SK needed to

"establish a different relationship with these guys[.]"   (Reynolds Decl., Ex. J at SK01166). Critically, this internal email from Mr. Smith is from the same period of time when Mr. Knapp was expressly encouraging CL with respect to its growth plans.  (Reynolds Decl., Ex. K at Tr. 36:16-19).

It is clear that SK was well aware of the mixed messages being sent to CL, as "mixed messages" had been a recurring theme dating back to the beginning of SK's relationship with CL.  In a May 2013 email exchange from Mr. Smith to Mr. Knapp, which occurred shortly before the sale of NYCL's assets to CL, Mr. Smith explained that Mr. Lewis was not correctly communicating SK's strategy to NYCL, and that he didn't understand "how to manage a complex relationship like [SK's relationship with NYCL]."  (Reynolds Decl., Ex. L).  During his deposition, Mr. Smith readily admitted that CL was not being told the truth about the relationship between CL and SK, stating that Mr. Lewis was not "explaining to the account the financial situation that we were in and all the things that we were unsatisfied with."  (Reynolds Decl., Ex. M at Tr. 77:15-19).

In a clear effort to avoid adhering to the "strategic partnership," SK undertook various bad faith actions, which ultimately destroyed the partnership between SK and CL, and resulted in CL losing significant customers and causing it to sustain millions of dollars in damages.

**A.      SK's Abrupt and Improper Termination of Waste Oil Payments to CL**

One of SK's most flagrant -- and ongoing -- breaches involves a Used Oil Incentive Agreement dated March 18, 2013 (the "Waste Oil Agreement").  (Reynolds Decl., Ex. N). Pursuant to the Waste Oil Agreement, NYCL agreed to provide SK with waste oil from various customers in exchange for payment.   The Waste Oil Agreement consists of two main components: (i) a per gallon commission component paid to CL, and (ii) an oil payment component, which was either paid directly to the customer or to CL.   (Id.).   Under this

agreement, NYCL, and later CL, provided SK with approximately 700,000 gallons of waste oil, annually.  In return, CL was receiving payments from SK in excess of $100,000 per month.

However, by letter dated December 16, 2014, SK informed CL that SK was adjusting all waste oil payment rates to $0.00 per gallon, effective December 21, 2014.  (Reynolds Decl., Ex. O).  SK contends that the December 16, 2014 letter "terminated" the Waste Oil Agreement, yet SK's position is belied by express language in the letter to the contrary.  Indeed, SK's December 16, 2014 letter expressly states that "Other terms and conditions of our oil collection service are unchanged."  (Id.)  Notably, SK does not deny that it has wrongfully withheld payment to SK under the Waste Oil Agreement in the amount of $243,429.95, for waste oil collected by SK from October 2014 through February 2015.  (Reynolds Decl., Ex. P).

During discovery it was uncovered that SK (i) continued to surreptitiously collect used oil from CL's customers without notifying CL and (ii) willfully withheld from producing to CL in discovery documents relating to SK's waste oil collections post-February 2015 to present.  In connection with a motion to compel discovery filed by CL, Magistrate Mann ordered that SK produce all documents relating to waste oil collections after its motions for summary judgment are adjudicated, and expressed the Court's "displeasure that defense counsel, in violation of F.R.C.P. 34, failed to make clear that it was withholding documents relating to waste oil received from plaintiff's customers after February 2015."  (Reynolds Decl., Ex. Q).  To this day, SK continues to collect waste oil from CL's customers, but has failed to remit any payment -- commission or oil payment -- to CL since September 2014.  CL's expert witness has calculated that CL has sustained an additional $691,072 in damages through May 2016 as a result of SK's breach of the Waste Oil Agreement.  (Reynolds Decl., Ex. R at 2-4).

**B.      SK's Improper Billing of CL and Refusal to Honor Prior Agreements**

Additionally, SK repeatedly billed CL for numerous products at the wrong price.  When CL refused to pay to SK the incorrect amounts, SK deducted payment from CL's line of credit. SK then used this artificial overdraft as a pretext to withhold credit to CL and, consequently, prevent CL from purchasing SK product, which SK knew CL required to maintain contractual obligations to its customers, including the MTA.  (Reynolds Decl., Ex. S at SK01258).  SK claims that the reason for its refusal to credit CL is the lack of pricing documentation.  This position is meritless because it ignores the course of dealing between NYCL/CL and SK, or SK's internal business practices.  Indeed, it was commonplace for price agreements to be made over the phone, and this was particularly true with respect to Messrs. Ioia and Stetz.  (Reynolds Decl., Ex. T at Tr. 186:19-187:18; Ex. U at Tr. 69:9-21; 70:22-71:7; 75:6-13).  As set forth herein, SK has attempted to exploit its own willingness to conduct business verbally in order to portray Messrs. Ioia and Stetz as opportunistic businessmen who lack documentation to back-up their version of the events.  However, it is undisputed that it was commonplace to place orders via telephone or in person, and that there was significant internal confusion at SK surrounding pricing -- particularly as it related to NYCL/CL pricing.  (Reynolds Decl., Ex. V (SK internal email chain from September 2013 showing confusion as to correct prices and approved price adjustments for CL's account); Ex. W (SK internal email chain from April 2014 showing that SK employees do not know the correct price to charge CL for a variety of products); Ex. X (August 2014 email from Mr. Smith to internal SK team discussing how SK sales team is doing a poor job at documenting price quotes to customers in general)).  Indeed, Mr. Ioia testified that it was SK's "*modus operandi*" to bill incorrectly and then later issue credits to correct SK's admitted mistakes.  (Reynolds Decl., Ex. U at Tr. 119:3-11).

Beginning in 2013, SK began to improperly overbill NYCL's, and later CL's, account, as set forth below, resulting in SK -- without prior notice -- foreclosing CL's access to credit needed to finance purchases required to meet contractual obligations owed to CL's customers.

### 1.    SK's Refusal to Honor Its Agreement in Connection with the MTA Extension Agreement

In the spring of 2012, the MTA offered NYCL an extension of its existing contract if NYCL committed to a price of $6.87 per gallon (the "MTA Extension Agreement"). (Reynolds Decl., Ex. U at Tr. 113:9-121:4; Ex. Y). At the time, SK was charging NYCL $6.68 per gallon to purchase CJ-4+Lubrizol to be distributed to the MTA. In order to commit to a price of $6.87 per gallon for the MTA Extension Agreement, NYCL required a lower price commitment from SK. Mr. Ioia met in-person with Mr. Lewis to discuss the situation. Mr. Lewis immediately called David Gempel, Vice President of SK's Oil Re-Refining Sales Division, and then brought in Mr. Ioia on the call. Mr. Gempel asked Mr. Ioia what his preferred profit margin would be on the MTA Extension Agreement, and Mr. Ioia told Mr. Gempel that he wanted to keep his current margin of $.83 per gallon, at the very least, but would prefer a profit margin of $1.40 per gallon. In response, Mr. Gempel assured Mr. Ioia that SK would commit to a price that would provide NYCL with a profit margin in that range. After the call, Mr. Lewis told Mr. Ioia to commit to the MTA Extension Agreement, which Mr. Ioia did. (Id.)

Shortly after Clean Harbors' acquisition of SK in early 2013, Mr. Ioia met with Messrs. Lewis and Gempel to inform them that SK was still incorrectly charging NYCL for shipments of CJ-4+Lubrizol earmarked for the MTA Extension Agreement at the incorrect price of $6.68 per gallon. (Id.) Unbeknownst to CL, ever since the acquisition of SK by Clean Harbors, SK had been operating in a state of perpetual confusion. (Reynolds Decl., Ex. M at Tr. 42:24-45:18; see also Ex. Z) For example, George Kaiser, SK's Director of U.S. Lubricant Sales & Distribution,

testified that following the acquisition of SK by Clean Harbors, SK was in a state of internal "mayhem" as it went "through a year of turmoil of things not working correctly, orders not processing right, just because of a brand new computer system." (Reynolds Decl., Ex. B at Tr. 29:6-30:6). Amidst the internal confusion and mayhem within SK, Mr. Gempel assured Mr. Ioia that he would issue a credit to NYCL in accordance with their prior agreement, which was an asset acquired by CL. (Reynolds Decl., Ex. Y; Stetz Aff., Ex. A). Mr. Gempel's employment with SK ended shortly thereafter. (Reynolds Decl., Ex. AA at Tr. 9:12-17). Ultimately, Mr. Smith, without ever denying that the pricing agreement occurred, refused to issue the credit to NYCL, claiming that SK did not have sufficient documentation to support the pricing agreement. (Reynolds Decl., Ex. BB). The evidence now proves that the denial of the credit for lack of documentation was merely a pretext established by the newly hired Mr. Smith to enhance SK's bottom line and avoid triggering certain payment obligations that would become due in connection with Clean Harbors' acquisition of SK if SK were to adhere to its pricing agreement with NYCL. (Reynolds Decl., Ex. CC).

Mr. Gempel does not recall the conversation he had with Mr. Ioia regarding pricing for the MTA Extension Agreement or issuance of a credit. (Reynolds Decl., Ex. AA at Tr. 30:23-33:17). Since the time that Mr. Gempel ceased being employed by SK, Messrs. Knapp and Kaiser were also let go by SK. Indeed, in a matter of months, there was no one left at SK who had personal knowledge of the pricing agreement reached by Mr. Ioia and SK representatives, with the exception of Mr. Lewis. Although Mr. Lewis recalls that a deal was struck between Mr. Ioia and Mr. Gempel, Mr. Lewis cannot recall the specific details of the agreement. (Reynolds Decl., Ex. DD at Tr. 101:14-102:9). Not a single current or former SK representative has testified that he recalls the specific details of the pricing agreement made with Mr. Ioia nor do

9

any witnesses contend that Mr. Ioia's recollection of the events is false.  SK's refusal to rectify the incorrect pricing has resulted in an overpayment by CL in the range of $227,068.16 to $429,300.74.  (Reynolds Decl., Ex. Y).

    **2.**     **SK's Refusal to Honor Its Promise to Provide CL with a $.15 Discount in Connection With CL Obtaining a Meeting with the MTA to Discuss CJ-4+Infineum**

Prior to CL's 2013 asset purchase, NYCL had reached an agreement with SK whereby SK agreed to provide NYCL a $.15 per gallon discount on CJ-4+Lubrizol if NYCL <u>persuaded</u> the MTA to add a certain SK product known as "CJ-4+Infineum" to its list of products approved for purchase by the MTA.  However, in July 2013, after CL's acquisition of NYCL's assets, CL negotiated a <u>new</u> agreement with SK under which CL would receive the credit once it facilitated a discussion with the MTA to consider using CJ-4+Infineum.  (Reynolds Decl., Ex. T at Tr. 64:1-16).  In exchange for using its contacts at the MTA to facilitate a discussion with MTA representatives regarding the MTA's use of CJ-4+Infineum, SK senior executive, Mr. Lewis, agreed that SK would provide the $.15 per gallon discount on CJ-4+Lubrizol purchased by CL for the duration of winning bid# 000005598 (the "Bid").  Indeed, Mr. Lewis testified as follows:

> Q.    Specifically I want to ask you about one portion of the second page of P9 where Mr. Stetz writes: 'Upon facilitating such meeting, our price on the EcoPower CJ-4 with Lubrizol additive drops to $5.50 per gallon delivered.'  Is it your understanding that in order to receive a credit of 15 cents per gallon, that NYCL had to obtain a meeting with the MTA to discuss putting Infineum on their approved product list?
>
> A.    Correct.
>
> Q.    Do you know if NYCL did procure a meeting with the MTA to discuss adding Infineum to the qualified products list?
>
> A.    I believe they did, but I just don't recall specifically.

(Reynolds Decl., Ex. DD at Tr. 113:19-114:12; 115:12-116:1 & 119:13-21).

In September 2013, CL did in fact obtain a meeting with the MTA to discuss accepting CJ-4+Infineum. (Reynolds Decl., Ex. EE. Consequently, in January 2014, the MTA released a bid for natural gas engine oil without specifying the required additive, which provided CL with the opportunity to submit a bid for CJ-4+Infineum. This was universally considered a success and opened the door for the opportunity for SK to finally supply CJ-4+Infineum to the MTA.

Thereafter, CL endeavored to reap the rewards for its success and submit a bid to the MTA to supply it with CJ-4+Infineum, as agreed upon with SK, but needed SK to provide the required technical data and support, without which no bid could be made. (Stetz Aff., Ex. E, at SK00186). CL requested this data from SK in person on August 20, 2013 and via email as early as September 9, 2013. (Reynolds Decl., Ex. G). At the time SK assured CL that they were "loaded for bear" and would be able to provide this support. (Reynolds Decl., Ex. EE at CL00471). Thereafter, CL asked SK for assistance on multiple occasions. Yet, SK failed to provide the requested data, and CL was therefore unable to submit a bid to provide the MTA with CJ-4+Infineum. Had CL received the necessary technical data, CL would have submitted a bid and obtained the contract, as it was clear from the bid parameters that the MTA had been persuaded by CL to consider CJ-4+Infineum, and CL was to benefit from the "exclusive price support" promised by SK. (Reynolds Decl., Exs. EE, GG & HH). Thereafter, SK refused to issue the $.15 per gallon credit and invoiced CL at the rate of $5.65 per gallon, resulting in a credit owed to CL in excess of $20,000. (Reynolds Decl., Ex. NN).

### 3. SK's Refusal to Honor a Price Adjustment Agreement for America's Choice and EcoPower NGEO

Throughout 2014, SK incorrectly billed CL $6.42 per gallon on 11,724 gallons of product known as "America's Choice" despite agreeing to charge only $5.76 per gallon. Further, SK incorrectly billed CL between $6.41 and $6.69 per gallon on 16,191 gallons of product known as

"EcoPower NGEO," despite agreeing to charge only $6.11 per gallon. (Reynolds Decl., Ex. T at Tr. 108:6-23; 110:12-113:5; 113:24-118:12 & Stetz Aff., ¶¶20-24). Despite requests to remedy these and other overcharges, SK, yet again, refused to honor its lower price commitments. (Reynolds Decl., Ex. T at Tr. 118:21-120:10).

Ultimately, as a result of SK's numerous deceptive and wrongful billing practices and improper refusal to issue the credits discussed above, CL's purported debt to SK continued to become inflated and SK seized the opportunity to -- without advance notice -- freeze CL's $750,000 credit line in the spring of 2014. (Reynolds Decl., Ex. T at Tr. 156:24-157:21). Of course, SK was well aware that CL relied upon its access to credit to purchase SK product that CL in turn distributed to its customers. Following the freezing CL's credit line, in May 2014, SK attempted to coerce CL into paying down this artificially inflated credit line by promising to credit CL's account for certain disputed credits if CL immediately paid nearly $300,000 -- a demand with which CL refused to comply. (Reynolds Decl., Ex. GG).

Throughout September and October 2014, representatives from CL and SK held meetings and conference calls to discuss the billing errors and failure of SK to issue credits owed for incorrect pricing. (Id.) By the end of October 2014, it was agreed that CL's account would be credited to account for SK's incorrect pricing. Despite this agreement, SK took no further action to correct CL's account balance. (Id.)

On November 11, 2014, Mr. Ioia met with Mr. Kaiser to discuss resolving the parties' disputes. At that meeting Messrs. Ioia and Kaiser agreed on a plan to correct the billing errors. After returning to SK and reporting the agreement to Mr. Smith, Mr. Smith ceased communications with Mr. Kaiser and, shortly thereafter, terminated Mr. Kaiser as an employee of SK. (Reynolds Decl., Ex. B at Tr. 19:4-20:12).

**C.**    **SK's Breach of the Agreement to Provide CL With Exclusive Price Support**

Despite the aforementioned assurances by SK of "exclusive price support," in February 2014, after CL was unable to submit a bid to the MTA due to SK's failure to provide the required technical data as discussed, *supra*, CL discovered that the winning bidder, GH Berlin, had won the bid with SK's product and price support. (Reynolds Decl., Ex. A at Ex. A thereto, at 5-6; see also Ex. II).    Subsequently, in July 2014, another competitor of CL's, Circle Lubricants, submitted a bid in connection with another MTA contract based on price support provided by SK notwithstanding Mr. Knapp's assurances that SK would not provide price support to CL's competitors. (Id.).

## LEGAL ARGUMENT

### POINT I

**THE EXISTENCE OF DISPUTED MATERIAL FACTS COMPELS THE DENIAL OF SUMMARY JUDGMENT AS TO COUNTS I, II, V AND VI OF THE COMPLAINT**

SK requests the dismissal of Count I, II, V and VI solely on the grounds that CL falsely claims that it and SK entered into an agreement to provide exclusive price support in the form of a $.15 credit on re-refined oil in connection with the Bid.  SK's position is devoid of merit and ignores that the basis for each of the aforementioned counts was conceded by Mr. Lewis, SK's Sr. Vice President of Sales -- and the most senior executive still employed by SK who was deposed by CL.

It is undisputed that CL and SK entered into an agreement whereby SK promised to credit CL $.15 per gallon distributed to the MTA in connection with the Bid in exchange for CL using its contacts to get the MTA to consider using CJ-4+Infineum.  (Reynolds Decl., Ex. T at Tr. 65:1-16 & Ex. JJ).

In July 2013, Messrs. Stetz and Lewis agreed that if CL was successful in obtaining a meeting with the MTA to discuss getting the MTA to accept CJ-4+Infineum, then SK would issue a $.15 per gallon credit to CL for all CJ-4+Lubrizol distributed to the MTA during the duration of the MTA bid.  This agreement was memorialized in a September 9, 2013 email authored by Mr. Stetz and sent to certain SK executives. (Reynolds Decl., Ex. JJ).  Indeed, SK's present position that CL was required to persuade the MTA to place CJ-4+Infineum on its QPL before being entitled to a $.15 per gallon credit is contrived by SK to avoid having to honor its obligations to CL.  Mr. Lewis admitted at his deposition that to be entitled to the $.15 credit CL was only obliged to obtain a meeting with the MTA to discuss using CJ-4+Infineum. Specifically, Mr. Lewis testified that CL's version of the agreement is correct.  (Reynolds Decl., Ex. DD at Tr. 113:19-114:12; 115:12-116:1; see also 119:13-21).  Standing alone, Mr. Lewis' testimony is fatal to SK's request for summary judgment on Counts I, II, V and VI.

SK's argument that the agreement to provide a .$15 credit in connection with the Bid is unenforceable for lack of consideration is meritless.  SK does not deny that getting the MTA to accept CJ-4+Infineum was of substantial value to both SK and CL.  (SK Mvg. Brf. at 6).  Indeed, from a marketing standpoint, SK considered the MTA account one of the "jewels that we [SK] held in our ring" because the account was high visibility and it was common knowledge in the re-refined oil industry that the MTA maintained (and continues to maintain) stringent requirements before a product was placed on the MTA's Qualified Products List ("QPL") (Reynolds Decl., Ex. B at Tr. 17:12-18-4).  From a revenue standpoint, getting the MTA to permit use of CJ-4+Infineum in place of the older, and more costly to manufacture, CJ-4+Lubrizol, would increase SK's profit margins on each gallon of re-refined oil supplied to the MTA.  Accordingly, there can be no doubt that the consideration for the $.15 credit agreement

was adequate and sufficient.  See RLS Associ., LLC v. United Bank of Kuwait PLC, 380 F.3d

704, 709 (2d Cir. 2004) ("So long as a contract provides some consideration, it may be minimal -

- even a peppercorn.  Courts do not inquire into the value or adequacy of the consideration.");

Zhao v. State University of N.Y., 472 F.Supp.2d 289, 316-17 (E.D.N.Y. 2007) ("Consideration

consists of either a benefit to the promisor or a detriment to the promisee, and it is enough that

something is promised, done, forborne or suffered by the party to whom the promise is made as

consideration for the promise made to him.  Moreover, the value or measurability of the thing

forborne or promised is not crucial so long as it is acceptable to the promisee.") (internal

citations omitted) .

## POINT II

### SK IN NOT ENTITLED TO SUMMARY JUDGMENT ON COUNT VII (PROMISSORY ESTOPPEL) OF THE AMENDED COMPLAINT BECAUSE CL IS ENTITLED TO DAMAGES IN CONNECTION WITH THIS CLAIM

SK argues that damages in a promissory estoppel claim are limited to actual or out-of-

pocket expenditures and that CL has failed to demonstrate that it incurred such damages in

reliance on SK's alleged promise of exclusivity and/or promise that it would extend a $.15 credit

to CL.  In support of its argument, SK principally relies upon two cases: Cyberchron Corp. v.

Calldata Sys. Dev. Inc., 47 F.3d 39, 44 (2d Cir. 1995) and Multi-Justice, S.A. v. Snapple

Beverage Corp., No. 02-cv-4635, 2006 WL 2683429, at *5 (S.D.N.Y. Sept. 18, 2006).  Both

cases fail to support SK's position and, in fact, SK's selective quotation from Cyberchron reveals

the weakness of SK's argument.  For example, SK intentionally omits a portion of the

Cyberchron decision plainly stating that reliance damages may be appropriate depending on the

facts of the case.  The complete quotation from Cyberchron flatly contradicts SK's argument.

See Cyberchron, 47 F.3d at 46 ("Prevailing on a promissory estoppel claim . . . *sometimes* entitles a party only to its out-of-pocket expenses, rather than to benefit-of-the-bargain damages.") (emphasis added).  Indeed, the Cyberchron court correctly noted that "[t]he damages recoverable in a promissory estoppel case are sometimes referred to as 'reliance damages,' namely, the actual expenditure made in preparation for performance or in performing the work which has been induced by the defendant-promisor."  Id.; see also Multi-Justice, S.A. v. Snapple Beverage Corp., No. 02-cv-4635, 2006 WL 2683429, at *5 (S.D.N.Y. Sept. 18, 2006) (applying reliance damages where facts of particular case – travel costs and incidental and reliance damages -- so warranted).

In connection with SK's motion to dismiss Counts I, II, VI and VII, it argues that CL's claim for breach of the $.15 per gallon credit agreement must fail as a matter of law because CL has failed to demonstrate that SK received valid consideration in exchange for issuing a $.15 per gallon credit to CL.  As a matter of law, CL plainly is entitled to seek reliance damages as an alternative to Counts I, II, VI and VII, which SK seeks to dismiss for lack of consideration. Indeed, pleading in the alternative is specifically permitted by the Federal Rules of Civil Procedure.  F.R.C.P. 8(d)(2); see also Knudsen v. Quebecor Printing (U.S.A.) Inc., 792 F. Supp. 234, 237 (S.D.N.Y.1992) (finding Rule 8(d)(2) to "permit plaintiffs to sue on a contract and at the same time alternatively repudiate the agreement and seek recovery on a quantum meruit claim"); Seiden Assoc., Inc. v. ANC Holdings, Inc., 754 F. Supp. 37, 39-40 (S.D.N.Y.1991) ("Both Fed. R. Civ P. 8(e)(2) and the pleading rules of New York State law permit the pleading of contradictory claims alleging both breach of a contract or, in the alternative, a quasi contract. Dismissal of plaintiff's alternative theories at this stage would violate the liberal policy of Rule

8(e)(2) which allows plaintiffs wide 'latitude' in framing their right to recover.") (internal citations omitted).

Mr. Stetz testified that CL relied to its detriment on SK's promise to provide a $.15 per gallon credit for re-refined oil supplied to the MTA for the duration of the Bid by investing time, money and resources in persuading the MTA to entertain CJ-4+Infineum as a viable product for purchase. During his deposition, Mr. Stetz was not asked to quantify the amount of time, money and resources devoted to facilitating a meeting with the MTA to discuss accepting CJ-4+Infineum on its QPL, but he is prepared to provide such testimony at trial. Given the nature of the information required to quantify CL's reliance damages, Mr. Stetz -- who is knowledgeable of the day-to-day affairs of CL -- is authorized to testify as to CL's damages sustained by relying on SK's promises. See F.R.E. 701 & comments; see also Lightning Lube, Inc. v. WITCO Corp., 4 F.3d 1153 (3d Cir. 1993) (permitting principal of plaintiff, who had knowledge of and participated in day-to-day affairs of organization, to provide opinion testimony concerning the amount of damages sustained by company as a result of the alleged misconduct of defendant-oil supplier); Von Der Ruhr v. Immtech Corp., 570 F.3d 858 (7th Cir. 2009) (recognizing rule that lay witnesses who are business owners may often testify to their lost profits or business expectations if their testimony is based on actual past performance in which they have been personally involved). The fact that counsel for SK failed to explore this area during Mr. Stetz's deposition does not mean that the evidence necessary to prove reliance damages does not exist.

Also without merit is SK's position that CL must rely upon an expert witness to establish damages in connection with a claim for promissory estoppel. Promissory estoppel may be invoked in two situations: (i) the enforcement of a promise in the absence of bargained-for consideration (i.e., detrimental reliance) and (ii) where a contract is rendered unenforceable by

operation of the Statue of Frauds.  See Merex A.G. v. Fairchild Weston Sys., Inc., 29 F.3d 821, 824 (2d Cir. 1994).  "Its application in any particular case depends on the context in which it appears."  See id. The context in which it arises will guide the type of damages available.  The Second Circuit has found that expectancy damages are available where promissory estoppel is used to enforce a promise in the absence of consideration and only reliance damages are available where promissory estoppel is being used to avoid the Statute of Frauds.  Id. at 825; Cf. Brookridge Funding Corp. v. Northwestern Human Resources, 170 Fed. Appx. 170 (2d Cir. 2006).  "The proper measure of damages in promissory estoppel cases is a traditional subject of controversy."  Mary E. Becker, "Promissory Estoppel Damages," 16 Hofstra L. Rev. 131, 131 (1987).  As a result, different approaches exist to measure damages in promissory estoppel cases: the reliance measure, the expectancy measure, and a flexible/discretionary approach.  Id. at 131.

In New York "[t]he doctrine of promissory estoppel may be asserted in a variety of different contexts, and the measure of damages to be obtained may differ as well, depending on the factual underpinnings supporting the claim."  Clifford R. Gray, Inc. v. LeChase Const. Servs., 51 A.D.3d 1169, 1171, 857 N.Y.S.2d 347, 349-50 (2008) (citing Merex v. Fairchild Weston Sys., 29 F.3d 821, 824 (2d Cir. 1994) (contrasting the remedies available when the doctrine is invoked as a substitute for consideration and when invoked to avoid injustice where the statute of frauds bars enforcement of an oral agreement), cert. denied 513 U.S. 1084, 115 S.Ct. 737, 130 L.Ed.2d 639 (1995)). Therefore, SK is incorrect that CL must rely upon expert testimony to establish damages in connection with a claim for promissory estoppel.

**POINT III**

**CL HAS ESTABLISHED A *PRIMA FACIE*
CASE OF FRAUD (COUNT IX)**

Under New York law, the elements of a fraud claim are: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." Childers v. New York & Presbyterian Hosp., 36 F.Supp.3d 292, 309 (S.D.N.Y. 2014).   To prevail on a fraud claim, a plaintiff must show by clear and convincing evidence both that it "actually relied" on a fraudulent statement and that its "reliance was reasonable or justifiable." KNK Enters., Inc. v. Harriman Enters., Inc., 33 A.D.3d 872, 824 N.Y.S.2d 307, 307 (2d Dep't 2006); Structured Capital Sols. v. Commerzbank AG, 177 F. Supp. 3d 816, 836 (S.D.N.Y. 2016).

SK does not assert that CL has failed to establish the elements of a fraud claim.  Instead, it argues that, in accordance with Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996), CL's fraud claim must be dismissed as duplicative of CL's breach of contract claims.  Notably, SK fails to discuss the scenarios set forth by the Second Circuit in which a breach of contract and fraud claim may coexist, but instead misleadingly states that "none would apply here."  (SK Mvg. Brf. at 9).  However, as made clear by Bridgestone and other decisions, claims for breach of contract and fraud may coexist if the alleged fraudulent misrepresentation is "'collateral to, but which was the inducement for the contract' and thus not duplicative of the contract claim[.]"   Id. at 20 (quoting Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc., 502 N.E.2d 1003, 1004 (1986)); see also Sofi Classic S.A. de C.V. v. Hurowitz, 444 F. Supp. 2d 231, 243-44 (S.D.N.Y. 2006) ("To state a fraud claim in conjunction with a breach of contract claim, a plaintiff must allege . . . a fraudulent representation collateral or extraneous to the contract[.]"); Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994) (holding

that defendant's intentional overstatements about its income and assets, which induced plaintiff to enter a contract with defendant, were actionable under fraud theory).

There can be no question that CL has established a *prima facie* case of fraud. CL has cited to numerous representations made by SK representatives (i) encouraging CL to expand its business based on promises that SK and CL would be "strategic partners" and (ii) that SK would provide "exclusive price support" to CL on NYC bids. The evidence demonstrates that both of these material representations were knowingly false, and that CL reasonably relied upon SK's false representations when expanding its business and investing in attempting to obtain MTA acceptance of CJ-4+Infineum. Indeed, the record establishes that at the same time SK was encouraging CL to expand its business to meet anticipated demand, internally, SK did not intend[1] to continue its "strategic partnership" with CL and, to the contrary, was taking steps to actively breach the agreement to provide "exclusive price support." Furthermore, CL contends that SK never intended to provide CL with the CJ-4+Infineum technical data required by the MTA.

These are not mere acts of breach of contract; rather, they are intentional misrepresentations that induced CL to take action based upon an understanding that it would enjoy "exclusive price support" to offset its investment in its organization required to distribute SK products, as contemplated in the MSMP. Based on SK's representations, CL entered into several contracts with its customers, which it lost money in connection with or lost entirely as a result of SK's refusal to adhere to its agreement to provide "exclusive price support."

---

[1] Courts are clear that "[o]rdinarily, the issue of fraudulent intent cannot be resolved on a motion for summary judgment, being a factual question involving the parties' states of mind." Golden Budha Corp. v. Canadian Land Co. of Am., N.V., 931 F.2d 196, 201-02 (2d Cir. 1991); see also State of N.Y. v. N. Storonske Cooperage Co., 174 B.R. 366, 390 (N.D.N.Y. 1994) (holding that genuine issue of fact existed as to whether defendant possessed the intent to fraudulently convey assets, explaining "[s]ummary judgment on a fraud claim of any kind is exceedingly rare due to the intent element, which, is almost always an issue of fact.").

The results of SK's intentionally false representations on SK were catastrophic. CL's damages expert has opined that CL has sustained lost profits damages as a proximate result of losing contracts with its customers and SK's refusal to provide product to CL in accordance with their agreement to be "strategic partners." CL's damages as a result of SK's fraudulent conduct exceed $800,000 through May 2016. (Reynolds Decl., Ex. R).

### POINT IV

**CL HAS ESTABLISHED CLAIMS FOR TORTIOUS INTERFERENCE WITH CONTRACT (COUNT X) AND PROSPECTIVE ECONOMIC ADVANTAGE (COUNT XI)**

SK contends that in order to assert viable claims for tortious interference with contract and prospective economic advantage CL must establish that the defendant had knowledge of the third party contract, a defendant is required to have full knowledge of the details or terms of the existing contract with that third party in order for the claim to survive. Such specific detail is not required. All that is required is that the defendant have knowledge of a contract's existence. See Gold Medal Farms, Inc. v. Rutland Cty. Co-op. Creamery, Inc., 9 A.D.2d 473, 478-79 (1959) ("We do not agree with these appellants that they must have full knowledge of the detailed terms of the existing contract between [the plaintiff] and [the third party], and we find nothing in the authorities cited by these appellants which so hold.").

There can be no question that SK had knowledge that CL had contracts with its customers to supply them with SK product. Also, there is no question that SK was aware that if it withheld SK product from CL, CL would be unable to fulfill its obligations with its customers, thereby resulting in damages to CL in lost profits. The sum of damages flowing from SK's tortious conduct equals nearly $1 million. (Reynolds Decl., Ex. R).

**POINT V**

**SK IS NOT ENTITLED TO SUMMARY JUDGMENT ON COUNT XII (DECLARATORY JUDGMENT), WHICH MUST BE ADJUDICATED TO DETERMINE THE PARTIES' OBLIGATIONS TO ONE ANOTHER**

CL seeks a declaratory judgment to determine the "validity and amount" of certain "disputed charges and whether and to what extent [CL] is responsible for same." (Complaint at 140(b)). This count is necessary to resolve the parties' differences with respect to the accuracy of certain invoices and the entitlement to credits owed by SK to CL. SK seeks to dismiss Count XII on the grounds that the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201(a) cannot be relied upon to determine the legal obligations owed by two parties with respect to a contract that is no longer in effect. SK's position is incorrect.

Federal Rule of Civil Procedure 57 provides for declaratory judgments in cases governed by the Federal Rules of Civil Procedure. The DJA provides, in relevant part:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).

The fundamental purpose of the DJA is to "avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage has accrued." Luckenbach Steamship Co. v. United States, 312 F.2d 545, 548 (2d Cir.1963); see also In re Combustible Equip. Assoc., 838 F.2d 35, 37 (2d Cir.1988) ("The purpose of the [DJA] is to enable parties to adjudicate claims

before either side suffers great damages."). It is "intended to ... 'settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationships.'" Dow Jones & Co., Inc. v. Harrods, Ltd., 237 F.Supp.2d 394, 405 (S.D.N.Y. 2002) (quoting Beacon Const. Co., Inc. v. Matco Elec. Co., Inc., 521 F.2d 392, 397 (2d Cir.1975)).

Indeed, parties routinely seek a declaratory judgment to determine their rights and responsibilities under an agreement.  In fact, this is one of the principal functions of the DJA. Thus, declaratory judgments are routinely utilized by parties to construe contracts "before and after breach" to determine the validity or rights of the parties.  12 Moore's Fed. Prac. § 57.80 (3d. 2016); see also Katzman v. Helen of Troy Texas Corp., 12-cv-4220, 2013 WL 325562 (S.D.N.Y. Jan. 28, 2013) (issuing declaratory judgment that ordered the release of funds from escrow fund); Joseph Victori Whines, Inc. v. Vina Santa Carolina, S.A., 933 F. Supp. 347 (S.D.N.Y. 1996) (issuing declaratory judgment as to termination date of contract); Dawson Home Fashions, Inc. v. SRCO Inc., 94-cv-6333, 1995 WL 679253, at *7 (S.D.N.Y. Nov. 15, 1995) (issuing declaratory judgment for return of escrow funds arising from breach of contract); Forbo-Giubiasco, S.A. v. Congoleum Corp., 78-cv-5390, at *11 (S.D.N.Y. Oct. 17, 1984) (issuing declaratory judgment that plaintiff fulfilled contract obligations to pay royalties).

## POINT VI

### SK HAS WAIVED ITS RIGHT TO ARBITRATE THE CLAIM BROUGHT IN COUNT XIII OF THE AMENDED COMPLAINT

SK speciously claims that Count XIII, which seeks to determine SK's liability under the Waste Oil Agreement, should be dismissed because it contains an arbitration clause.

The Waste Oil Agreement is governed by New York law, which provides that a party that has taken advantage of the discovery process afforded litigants will be deemed to have waived its right to compel arbitration. <u>See</u> <u>Nishio v, E.F. Hutton & Co., Inc.</u>, 168 A.D.2d 224, 562 N.Y.S.2d 112 (1st Dept. 1990) (holding defendant waived its right to arbitration where it filed an affirmative pleading, responsive pleading, sought discovery of documents and waited nearly a year before seeking to compel arbitration); <u>see also</u> <u>De Sapio v. Kohlmeyer</u>, 321 N.E.2d 770, 362 N.Y.S.2d 843 (1974) ("where the defendant's participation in the lawsuit manifests an affirmative acceptance of the judicial forum, with whatever advantages it may offer in the particular case, his actions are then inconsistent with a later claim that only the arbitral forum is satisfactory).

On August 13, 2015, CL amended its Complaint to add a claim for breach of the Waste Oil Agreement (Count XIII). Since that time, SK has filed an Answer to the Complaint, Affirmative Defenses and Counterclaim. Additionally, SK and CL have exchanged thousands of pages of documents, and SK has taken the deposition of several CL witnesses, including Mr. Stetz, the President of CL, questioning him at length concerning CL's claim for breach of the Waste Oil Agreement. (Reynolds Decl., Ex. T at Tr. 218-235).

Discovery has revealed that SK, admittedly, owes CL $243,429 for waste oil collected by SK from CL's customers from September 2014-February 2015. (Reynolds Decl., Ex. P). Further, Magistrate Mann determined that CL surreptitiously continued to collect waste oil from CL's customers, yet never provided payment to CL. (Reynolds Decl., Ex. Q) CL's expert witness calculates that CL's damages relating to waste oil collection post-February 2015 amount to more than $600,000 through May 2016. (Reynolds Decl., Ex. R).

24

Conveniently, SK now -- after two years of litigation -- requests that this Court permit it to avoid having to answer for its breach of the Waste Oil Agreement.  Plainly, by SK's own participation in this action and use of its discovery process afforded to litigants in this Court, SK has waived its right to arbitrate the parties' dispute in connection with the Waste Oil Agreement.

Indeed, making SK's request for removal of Count XIII all the more brazen, is its total ignorance of the fact that it has wrongfully and willfully withheld documents from CL relating to the amount of oil collected by SK from February 2015 to the present.  Given that SK already acknowledges that it owes CL $243,429 for waste oil collected by CL from October 2014 through February 2015, it is more than likely that CL is entitled to additional payments for waste oil that was surreptitiously collected by SK during the pendency of this lawsuit.  However, CL must await SK's supplemental document production before knowing the exact volume of waste oil collected by SK in breach of the Waste Oil Agreement and, consequently, additional amounts due and owing from SK to CL under the Waste Oil Agreement.

## **CONCLUSION**

Based on the foregoing, plaintiff, Commercial Lubricants, LLC, respectfully requests that the Court deny SK's Motion as to Counts I, II, V, VI, VII, IX, X, XI, XII and XIII. CL consents to the dismissal of Count VIII (Equitable Estoppel).

Respectfully submitted,

RIKER, DANZIG, SCHERER, HYLAND
& PERRETTI LLP

Attorneys for Plaintiff,
Commercial Lubricants, LLC

By: _____
Scott E. Reynolds

Date: December 14, 2016
4796307v2