UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

COMMERCIAL LUBRICANTS, LLC,

|                          |                              |
|--------------------------|------------------------------|
| Plaintiff,               | **MEMORANDUM & ORDER**       |
| v.                       | 14-CV-7483 (MKB)             |

SAFETY-KLEEN SYSTEMS, INC.,

Defendant.

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Plaintiff and Counterclaim-Defendant Commercial Lubricants, LLC commenced the above-captioned action against Defendant and Counterclaim-Plaintiff Safety-Kleen Systems, Inc., alleging that Defendant breached certain contracts relating to the distribution of recycled oil. (Compl., Docket Entry No. 1.) On August 13, 2015, Plaintiff filed the Second Amended Complaint ("SAC"), asserting claims for breach of an exclusivity agreement, breach of an implied exclusivity agreement, breach of a credit agreement, breach of the implied covenant of good faith and fair dealing, promissory estoppel, equitable estoppel, fraud, tortious interference with contract, tortious interference with prospective economic advantage, declaratory judgment and breach of a contract to dispose of "waste oil." (*See generally* SAC, Docket Entry No. 14.) Defendant filed counterclaims on March 16, 2015, alleging that Plaintiff breached a contract between the parties and was unjustly enriched by accepting Defendant's recycled oil product throughout 2014 without paying. (Counterclaim ¶¶ 22–35, Docket Entry No. 8.)

Defendant moves for partial summary judgment on Plaintiff's claims, as described below, and for summary judgment on its counterclaims. (Def. Mot. for Partial Summ. J. ("Def. Mot."), Docket Entry No. 39; Def. Mem. in Supp. of Def. Mot. ("Def. Mem."), Docket Entry No. 39-1; Def. Mot. for Summ. J. on Counter-claims ("Def. CC Mot."), Docket Entry No. 38; Def. Mem. in Supp. of Def. CC Mot. ("Def. CC Mem."), Docket Entry No. 38-1.) For the reasons discussed below, the Court grants Defendant's motion for partial summary judgment in part as to Plaintiff's claims for breach of the implied covenant of good faith and fair dealing and grants Defendant's motion for partial summary judgment as to Plaintiff's claims for promissory estoppel, equitable estoppel, fraud, tortious interference with contract and with prospective economic advantage, and declaratory judgment. The Court reserves judgment on the claim for breach of the "waste oil" agreement. Finally, the Court denies Defendant's motion for partial summary judgment as to Plaintiff's claims for breach of the exclusivity agreement and the implied exclusivity agreement, as well as Defendant's motion for summary judgment on its counterclaims for breach of contract and unjust enrichment.

## I.  Background

### a.  Factual history

#### i.  The parties' relationship and the Distributor Agreement

Defendant is a used oil re-refiner, and Plaintiff is a distributor of recycled oil products in the New York metropolitan area.[1]  (Def. 56.1 ¶¶ 1–2.)  On April 11, 2012, Defendant and a

---

[1]  The facts are undisputed except as noted.  For ease of reference, the Court refers to the filings as follows: Def. Statement of Material Facts Pursuant to Local R. 56.1 in Supp. of Def. Mot. for Partial Summ. J. ("Def. 56.1"), Docket Entry No. 39-2; Pl. Response to Def. 56.1 ("Pl. 56.1"), Docket Entry No. 45; Def. Statement of Material Facts Pursuant to Local R. 56.1 in Supp. of Def. Mot. for Summ. J. on Counter-claims ("Def. CC 56.1"), Docket Entry No. 38-2; Pl. Response to Def. CC 56.1 ("Pl. CC 56.1"), Docket Entry No. 46.

company called New York Commercial Lubricants ("NYCL") entered into a contract governing NYCL's distribution of Defendant's recycled oil product (the "Distributor Agreement"). (*Id.* ¶¶ 3, 11.) On July 17, 2013, through an asset purchase agreement (the "APA"), Plaintiff purchased the assets of NYCL. (Aff. of Gary Stetz in Opp'n to Def. Mots. ("Stetz Aff.") ¶ 2, Docket Entry No. 43.) Under the terms of the APA, Plaintiff purchased many of NYCL's contractual rights, including the right to conduct business under NYCL's commercial name, "Metrolube." (Def. 56.1 ¶ 5.) According to Plaintiff, it neither acquired nor was assigned the Distributor Agreement in connection with the APA.[2] (Pl. 56.1 ¶¶ 8–10; Stetz. Aff. ¶¶ 4–6.) According to Defendant, Plaintiff effectively "stepped into the shoes" of NYCL because it kept the same employees, facility, equipment and website. (Def. CC 56.1 ¶ 5.)

Under the terms of the Distributor Agreement, NYCL was obligated to purchase an annual minimum amount of Defendant's product, together with such additional product as NYCL may order. (Distributor Agreement ¶ 2.) The pricing for the products was set forth as an attachment to the Distributor Agreement, but the Distributor Agreement further provided that "[p]rices are subject to change at any time upon written notice." (*Id.* ¶ 4.) Payment was due

---

[2] Plaintiff directs the Court to the portion of the APA relating to contractual rights, which is located within a section of the APA enumerating the "purchase and sale of assets." (APA at 2, annexed to Stetz Aff. as Ex. A.) According to the APA, Plaintiff purchased from NYCL (the "Seller"):

> Contractual rights. All rights of Seller, as of the Closing Date, in and to all Contracts (as defined below) specifically identified on Schedule 1.1(b). As used in this Agreement, "Contracts" means any and all rights under any written contract . . . specifically identified on Schedule 1.1(b).

(*Id.* at 3.) However, the copy of the APA provided to the Court does not include Schedule 1.1(b); therefore, the Court is unable to determine whether, as Plaintiff claims, the Distributor Agreement was not transferred as part of NYCL's asset sale to Plaintiff. Defendant does not address whether the Distributor Agreement was transferred to Plaintiff, but appears to argue that Plaintiff conducted business with Defendant as though it was aware of its obligations under the Distributor Agreement. (Def. CC 56.1 ¶ 5.)

within thirty days of the date of Defendant's invoice, and unpaid amounts would be subject to interest at 1.5% per month. (*Id.* ¶ 13.) Both parties were entitled to "immediately terminate" the Distributor Agreement if the other party failed to perform in accordance with the Distributor Agreement or breached any provision of the Distributor Agreement and failed to correct the breach within thirty days' notice. (*Id.* ¶ 17.) Both parties were also permitted to terminate the Distributor Agreement with ninety days' notice. (*Id.*) No modifications to the Distributor Agreement would be deemed binding on either party unless in writing and signed by both parties. (*Id.* ¶ 25.)

The parties do not dispute that after Plaintiff purchased NYCL's assets, Plaintiff supplied Defendant's oil to Plaintiff's customers, including to the New York City Metropolitan Transportation Authority ("MTA"). (Def. 56.1 ¶ 10; Deposition of Gary Stetz ("Stetz Dep.") 250, 253–54, Docket Entry No. 39-4.) According to Plaintiff, the pricing for these products was established through in-person, telephone and, rarely, e-mail negotiations between Plaintiff and Defendant, rather than through form "pricing letters," as the Distributor Agreement contemplates. (Stetz Aff. ¶ 10.) In addition, "contrary to the express terms of the Distributor Agreement," Gary Stetz, the Managing Member of Commercial Lubricants, personally negotiated with Defendant a sixty-day payment period on each invoice. (*Id.* ¶ 11.)

Plaintiff states that the preexisting relationship between NYCL and Defendant was "a large part of the reason [Plaintiff] purchased the assets of NYCL." (*Id.* ¶ 12.) Prior to and following the execution of the APA, Stetz had many conversations with Defendant's representatives, "such as Curt Knapp and Steve Lewis,"[3] who assured him that the "strategic

---

[3] In general, neither party explains the roles of the key representatives. It appears that Curt Knapp was Defendant's Executive Vice President of Marketing and Oil Re-refining Sales

partnership" would continue after the APA. (*Id.*) Plaintiff made "certain investments in its operations" knowing that it would receive a return on its investment from Defendant's guarantee that the "strategic partnership" would continue, particularly through the "exclusive price support," or preferred pricing, that Defendant granted Plaintiff.[4] (*See id.* ¶ 13.) Plaintiff also asserts that the course of dealing between the parties "included frequent in-person and over the telephone negotiations of pricing terms, discounts and credits," little of which was memorialized. (*Id.* ¶ 15.)

Plaintiff alleges that in late 2013 and throughout 2014, Defendant stopped communicating its strategy to Plaintiff and sought to avoid adhering to the "strategic partnership" by sending Plaintiff "mixed messages."[5] (Pl. Opp'n 4–5.)

---

and Steve Lewis was the Vice President of Sales. (*See* Email from Curt Knapp dated Sept. 23, 2013, Docket Entry No. 44-1.)

[4] Although Plaintiff states in its papers that Defendant promised it preferred pricing in connection with its distribution of Defendant's re-refined oil, (*see* Stetz Aff. ¶ 13; Pl. Mem. of Law in Opp'n to Def. Mot. ("Pl. Opp'n") 3, Docket Entry No. 41.), it cites only to e-mail correspondence that does not mention any preferred pricing and that appears to be part of broader communications regarding exclusivity arrangements between the parties, (*see* Pl. Opp'n 3). Plaintiff does not explain the terms of what it refers to as the "exclusivity arrangement," or whether it was separate from the agreement to provide "exclusive price support." (*See* Stetz Aff. ¶ 13.)

[5] In support of this allegation, Plaintiff cites to an e-mail chain internal to Defendant's organization in which Defendant's new management suggests it is time to "establish a different relationship with [Plaintiff]," but also states, "I like what [Plaintiff is] doing and I think we can do some things with them, but we don't want to send them aggressive pricing without any gallons." (Email from Mike Smith dated Oct. 10, 2013, Docket Entry No. 44-4.) Plaintiff also cites a line from another e-mail chain between Mike Smith and Curt Knapp of Safety-Kleen in which Smith states that another of Defendant's managers of the relationship with Plaintiff "doesn't understand how to manage a complex relationship like this [one with Plaintiff]." (Email from Mike Smith dated May 24, 2013, Docket Entry No. 44-5.)

### ii. MTA bids

Plaintiff had a contract with the MTA for the sale of a line of Defendant's oil product, CJ-4+Lubrizol,[6] which arose from Plaintiff's winning bid #5598 with the MTA. (Def. 56.1 ¶ 11.) Defendant wanted the MTA to switch from using CJ-4+Lubrizol, an older product, to CJ-4+Infineum, a new product, because it would be more profitable for both Plaintiff and Defendant. (*Id.* ¶ 13.) In July of 2013, after Plaintiff acquired NYCL's assets, Plaintiff negotiated a new agreement with Defendant under which Plaintiff would receive a fifteen-cent-per-gallon discount on the CJ-4+Lubrizol needed to complete bid #5598 with the MTA.[7] (Stetz Aff. ¶ 23.) According to Defendant, it agreed to provide Plaintiff with the discount only if Plaintiff "[brought] about that change at the [MTA]," (*id.* ¶ 14) — namely, convinced the MTA to switch to CJ-4+Infineum. According to Plaintiff, Defendant agreed to provide the discount if Plaintiff simply facilitated a meeting with the MTA to discuss adding CJ-4+Infineum to the

---

[6] CJ-4 is a type of natural gas engine oil ("NGEO"), and Lubrizol and Infineum are additives. (Pl. Opp'n 2.)

[7] The parties have not directed the Court to any documentation to support this agreement except an e-mail from Gary Stetz to Steve Lewis, a representative at Defendant's organization, that reads, in relevant part:

> First and in regard to the EcoPower CJ-4 with Lubrizol additive that we are about to supply New York City Mass Transit Association ("NYC/MTA") under contract. It is my understanding that our price for the duration of the contract will be $5.65 per gallon delivered. Thus allowing us a $.49 per gallon gross margin before our delivery and overhead costs until such time that we facilitate a meeting with NYC/MTA regarding the adding of the EcoPower CJ-4 with Infineum additive to their Qualified Product List ("QPL"). Upon facilitating such meeting, our price on the EcoPower CJ-4 with Lubrizol additive drops to $5.50 per gallon delivered. I have initiated that process and will communicate with Mr. Knapp later today as to the status.

(Email from Gary Stetz to Steve Lewis dated Sept. 9, 2013, Docket Entry No. 43-5.)

MTA's Qualified Product List. (Stetz Aff. ¶ 23; Pl. 56.1 ¶ 14.) The parties do not dispute that Plaintiff did, in fact, facilitate the meeting with the MTA, and that Defendant did not provide the fifteen-cent discount.[8] (Stetz Aff. ¶ 23.) Plaintiff states that as a result of Defendant's failure to issue the fifteen-cent discount per gallon on CJ-4+Lubrizol for the duration of the MTA bid #5598, Defendant owes Plaintiff "tens of thousands of dollars." (*Id.* ¶ 24.)

Plaintiff further contends that between September of 2013 and February of 2014, it convinced the MTA to "consider" adding CJ-4+Infineum on its Qualified Products List and requested from Defendant the data and information that the MTA "required to approve CJ-4+Infineum and place that product on its Qualified Products List." (Am. Compl. ¶¶ 41–42.) Despite the repeated requests, Defendants allegedly failed to provide the requested data and information. (*Id.* ¶ 43.) Plaintiff states that as a result of its efforts to persuade the MTA to consider CJ-4+Infineum, the MTA put out a bid in January of 2014 for an NGEO without specifying what additive was required. (*Id.* ¶ 45.) This allowed Plaintiff to submit a bid for oil with Infineum; however, without the technical data that the MTA required and that was in

_____

[8] The parties do not provide the date of this meeting with the MTA. Although it is not explicitly stated whether the MTA switched to CJ-4+Infineum, the Court understands from various documents in the record that the MTA opened bids on a project that would have permitted CJ-4+Infineum to be offered, provided that Plaintiff could first obtain approval to place CJ-4+Infineum on the Qualified Products List. Plaintiff argues that when it attempted to submit CJ-4+Infineum to the Qualified Products List so that Plaintiff could submit the new formula for MTA bids, Defendant refused to provide the necessary technical and safety data to secure the product's position on the Qualified Products List, without which Plaintiff could not bid with CJ-4+Infineum. (*See* Pl. Interrog. Responses at 18, annexed to Reynolds Decl. as Ex. A; *see also* Am. Compl. ¶ 41 (alleging that Plaintiff "made significant progress" in discussions with New York City officials to educate them about the Infineum additive and to "obtain consideration of CJ-4+Infineum for the NYCMTA Qualified Product List"); *id.* ¶¶ 42–43 (alleging that Plaintiff "repeatedly asked Defendant to provide data and information that [the MTA] required to approve CJ-4+Infineum and place that product on its Qualified Products List").)

Defendant's exclusive possession, Plaintiff alleges that it was unable to submit the bid. (*Id.* ¶¶ 45–47.) The bidding period closed on February 26, 2014, and Plaintiff did not submit a bid because it lacked the necessary technical data. (*Id.* ¶ 48.)

Plaintiff also asserts that Defendant agreed it would provide to Plaintiff "exclusive pricing support for sales of Defendant's re-refined oil" to New York City agencies, including the MTA. (*Id.* ¶ 14.) That is, Defendant agreed that it would provide lower pricing to Plaintiff than to Plaintiff's competitors for the sale of re-refined oil that would be submitted in connection with bids to New York City agencies.[9] (*Id.*) Plaintiff asserts, however, that it learned Defendant had provided price support to GH Berlin, a rival distributor, which allowed GH Berlin to submit a bid to the MTA and receive the contract. (*Id.* ¶ 49.) In July of 2014, the MTA put out a bid for CJ-4+Lubrizol, which another distributor, Circle Lubricants, won. (*Id.* ¶ 50.) Plaintiff alleges that, in breach of the parties' exclusivity agreement, Defendant provided technical support to Circle Lubricants, which won the bid. (*Id.*)

### iii. Billing issues

Defendant extended a $750,000 line of credit to Plaintiff for the purchase of Defendant's products.[10] (Credit Appl., Docket Entry No. 44-4.)

Defendant states that after the APA, Plaintiff "continued to purchase and re-sell [Defendant's] products in accordance with the Distributor Agreement." (Def. CC 56.1 ¶ 12.)

---

[9] It is unclear to the Court whether this alleged agreement was in connection with a particular line of product or relates to one of the other agreements at issue in the action.

[10] The parties do not provide the date that this credit line was established. The credit application before the Court is dated May 29, 2014, (*see* Credit Appl.), but the Amended Complaint alleges that "beginning in late 2013, Defendant repeatedly overcharged Plaintiff for product" and deducted it from Plaintiff's line of credit, (*see* Am. Compl. ¶ 18), which suggests that the line of credit was established prior to 2014.

Although Plaintiff disputes that it was ever a party to or an assignee of the Distributor Agreement, Plaintiff does not dispute that throughout 2014, Defendant delivered product to Plaintiff and Plaintiff accepted the product and resold it to customers. (*See* Def. CC. 56.1 ¶¶ 13–16; Pl. CC 56.1 ¶¶ 13–16.)

On November 19, 2014, Defendant sent Plaintiff a final demand letter because Plaintiff had failed to pay for several shipments of product. (Def. 56.1 ¶ 17.) Defendant asserts that Plaintiff owed $1,056,383.57. (*Id.*) Plaintiff disputes the amount and asserts that Defendant never delivered "credits," amounting to $220,000 or the discounted pricing it promised. (Stetz Aff. ¶ 13.) For example, Plaintiff states that Defendant incorrectly billed Plaintiff at $6.42 per gallon on 11,724 gallons of a product known as "America's Choice," despite agreeing to charge only $5.76 per gallon. (*Id.* ¶ 20.) Plaintiff also states that, throughout 2014, Defendant incorrectly billed Plaintiff between $6.41 and $6.69 per gallon on 16,191 gallons of product known as "EcoPower NGEO," despite agreeing to charge $6.11 per gallon.[11] (*Id.* ¶ 21.) Plaintiff asserts that it brought the pricing errors to Defendant's attention, but the errors were never remedied. (*Id.* ¶ 22.)

Plaintiff contends that as a result of its failure to pay incorrect invoices that Defendant issued, Defendant deducted payment from Plaintiff's line of credit and used this "artificial overdraft" as a pretext to withhold credit from Plaintiff, which prevented Plaintiff from buying Defendant's product and following through on its contracts with customers. (*Id.* ¶ 18.)

### iv. The Waste Oil agreement

On March 18, 2013, prior to Plaintiff's purchase of NYCL's assets, NYCL and Defendant entered into a Used Oil Incentive Agreement (the "Waste Oil Agreement") with an

---

[11] The record contains no documentary evidence of these agreements.

expiration date of December 31, 2014.  (Def. 56.1 ¶ 15; Waste Oil Agreement, Docket Entry No. 44-5.)  As part of the Waste Oil Agreement, NYCL agreed to provide Defendant with waste oil from various customers in exchange for payment.  The Waste Oil Agreement consisted of two main components: (1) a per-gallon commission paid to Plaintiff and (2) an "oil payment" paid either directly to the customer or to Plaintiff.  (*See* Waste Oil Agreement at 2.)  The Waste Oil Agreement permits either party to terminate the contract "upon [sixty] days['] prior written notice" and provides that during the sixty-day period, "both parties will maintain customer services and billing."  (*Id.* at 1.)  In addition, the Waste Oil Agreement provides that any disputes arising under the contract will be referred to binding arbitration in Erie County, New York.  (*Id.* at 2.)

On December 16, 2014, Defendant terminated the Waste Oil Agreement effective December 21, 2014, citing a downturn in global energy markets.  (Def. 56.1 ¶ 20; Pay-For-Oil Rate Reduction Letter dated Dec. 16, 2014, Docket Entry No 44-5.)  Defendant's letter, addressed to "Dear Valued Customer," states that "[e]ffective December 21st or as contracts allow, all pay-for-oil rates will be moved to $0.00/gallon.  Other terms and conditions of our oil collection service are unchanged."  (Pay-For-Oil Rate Reduction Letter; Pl. 56.1 ¶ 20.)  Defendant states that this language terminated the Waste Oil Agreement, (Def. 56.1 ¶ 20); Plaintiff states that the Waste Oil Agreement was not terminated because the letter expressly states that "[o]ther terms and conditions of our oil collection service are unchanged," (Pl. 56.1 ¶ 20).  Nevertheless, Stetz acknowledged that he understood the letter to terminate the Waste Oil Agreement because Plaintiff would not refer its clients to Defendant without a per-gallon commission.  (Stetz Dep. 224–25.)

On January 21, 2015, the Department of Citywide Administrative Services of New York

("DCAS") contacted Defendant and inquired whether Plaintiff remained an authorized distributor of Defendant's products. (Def. 56.1 ¶ 23.) Defendant responded that Plaintiff was no longer an authorized distributor. (*Id.* ¶ 24.) On January 30, 2015, after the Complaint was filed in the instant action, Defendant's counsel mailed Plaintiff a letter terminating the Distributor Agreement. (Notice of Termination, Docket Entry No. 39-16.)

### b. Procedural history

Plaintiff filed the instant action on December 23, 2014, filed the Amended Complaint on February 26, 2015, and filed the SAC on August 13, 2015. (*See* Compl; Am. Compl., Docket Entry No. 7; SAC.) In the SAC, Plaintiff asserts claims for: (1) breach of the exclusivity agreement, (2) breach of the implied covenant of good faith and fair dealing as to the exclusivity agreement, (3) breach of the credit agreement, (4) breach of the implied covenant of good faith and fair dealing as to the credit agreement, (5) breach of implied contract, (6) breach of the implied covenant of good faith and fair dealing as to the implied contract, (7) promissory estoppel, (8) equitable estoppel, (9) fraud, (10) tortious interference with contract, (11) tortious interference with prospective economic advantage, (12) declaratory judgment and (13) breach of the waste oil agreement. (*See generally* SAC.)

On March 16, 2015, Defendant filed counterclaims alleging that Plaintiff breached the Distributor Agreement and was unjustly enriched as a result. (Counterclaim ¶¶ 22–35.)

## II. Discussion

### a. Standard of review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Davis v. Shah*, 821 F.3d 231,

243 (2d Cir. 2016); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id*. The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. Partial summary judgment on the SAC

Defendant moves for partial summary judgment on all claims in the SAC except for the Breach of the Credit Agreement, count three, and Breach of the Implied Covenant of Good Faith and Fair dealing as to the Credit Agreement, count four.[12] (Def. Mem. 5–14.)

### i. Breach of exclusivity agreement and implied exclusivity agreement

Plaintiff's breach of the exclusivity agreement and breach of an implied agreement claims, counts one and five of the SAC, rely on nearly identical allegations — that Defendant breached its obligations under its agreement with Plaintiff to provide exclusive price support for sales of Defendant's product to New York City agencies and to sell CJ-4+Lubrizol to Plaintiff for $5.50 per gallon for the duration of Plaintiff's bid #5598. (SAC ¶¶ 56–58, 75–79.)

---

[12] Because Plaintiff "consents to the voluntary dismissal" of count eight, for equitable estoppel, (*see* Pl. Opp'n 2), the Court grants Defendant's motion for summary judgment on count eight and dismisses Plaintiff's equitable estoppel claim.

Defendant argues that Plaintiff's claims based on the "exclusivity agreement" fail as a matter of law because Plaintiff and Defendant never reached a meeting of the minds with respect to a material term of the exclusivity agreement and, even if they had, the contract was unenforceable for lack of consideration because Plaintiff's interpretation that it simply had to get the MTA to consider adding CJ-4+Infineum imposed no obligation on Plaintiff. (Def. Mem. 5–6.) Plaintiff argues that Defendant's Vice President of Sales, Steve Lewis, stated at his deposition that he understood the exclusivity agreement to operate in precisely the way Plaintiff did, and that as a result, there is no dispute that Plaintiff was entitled to a fifteen-cent-per-gallon discount on all CJ-4+Lubrizol distributed to the MTA for the duration of bid #5598. (Pl. Opp'n 13–14.) Plaintiff also argues that its responsibility under the contract to have the MTA consider switching to CJ-4+Infineum constituted adequate consideration. (*Id.* at 14.)

Under New York law, a plaintiff alleging breach of contract must show "(1) the existence of a contract, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Hudson & Broad, Inc. v. J.C. Penny Corp., Inc.*, 553 F. App'x 37, 39 (2d. Cir. 2014) (internal quotation marks omitted) (citing *Harasco Corp. v. Sequi*, 91 F.3d 337, 348 (2d Cir. 1996)). A contract exists and is valid "if there is an offer and acceptance, consideration, mutual assent, and an intent to be bound."[13] *McNamara v. Tourneau, Inc.*, 464 F.

---

[13] The Court rejects Defendant's argument that the contract is illusory for lack of consideration. (*See* Def. Mem. 6.) In New York state, "[t]he law is well settled that in order for a promise to be enforceable as a contract, the promise must be supported by valid consideration. Consideration is defined as either a bargained for gain or advantage to the promisee or a bargained for legal detriment or disadvantage to the promisor." *Greenberg v. Greenberg*, 646 F. App'x 31, 31 (2d Cir. 2016) (quoting *Startech, Inc. v. VSA Arts*, 126 F. Supp. 2d 234, 236–37 (S.D.N.Y. 2000)); *see also Beitner v. Becker*, 824 N.Y.S.2d 155, 156 (2006) ("All contracts must be supported by consideration, consisting of a benefit to the promisor or a detriment to the promisee." (citations omitted).

Supp. 2d 232, 238 (S.D.N.Y. 2006) (citing *Register.com v. Verio*, 356 F.3d 393, 427 (2d Cir. 2004)).

"To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."[14] *Tractabel v. Energy Mktg, Inc. v. AEP Power Mktg, Inc.*, 487 F.3d 89, 95 (2d Cir. 2007). There must be "an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Id.* Under New York law,[15] "[i]f there is no meeting of the minds on all essential

---

[14] "[T]raditional principles of contract law provide that parties are free to make their bargain, even if the consideration exchanged is grossly unequal or of dubious value." *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 374 (2d Cir. 2000) (internal quotation marks omitted) (quoting *Apfel v. Prudential–Bache Sec.*, 81 N.Y.2d 470, 475 (1993)); *see also Coleman v. Sys. Dialing LLC*, No. 15-CV-3868, 2016 WL 3387748, at *3 (S.D.N.Y. June 17, 2016) ("Courts do not weigh the relative value of the consideration exchanged because '[u]nder the traditional principles of contract law, the parties to a contract are free to make their bargain, even if the consideration exchanged is grossly unequal or of dubious value.'" (alteration in original) (quoting *Apfel*, 81 N.Y.2d at 475)); *Moezinia v. Ashkenazi*, 26 N.Y.S.3d 192, 193 (App. Div. 2016) (Contracting parties "are free to make their bargain, 'even if the consideration exchanged is grossly unequal or of dubious value.'" (quoting *Apfel*, 81 N.Y.2d at 475)). So long as a contracting party receives "something of value under [a] contract, the contract [will] not be void for lack of consideration." *Nadel*, 208 F.3d at 374 (internal quotation marks omitted) (quoting *Apfel*, 81 N.Y.2d at 476); *see also Moezinia*, 26 N.Y.S.3d at 193 ("[A]bsent fraud or unconscionability, the adequacy of consideration is not a proper subject for judicial review. It is enough that something of real value was exchanged . . . ." (citing *Apfel*, 81 N.Y.2d at 476)). Here, there is no dispute that Defendant wanted the MTA to place CJ-4+Infineum on its Qualified Products List, and Defendant provides no support for its argument that having Plaintiff attempt to convince the MTA to make that switch would provide no value to Defendant. (*See* Def. Mem. 6.) Accordingly, the Court does not find the contract unenforceable for lack of consideration.

[15] The parties' arguments assume that they intended to be bound by the exclusivity agreement as orally reached and partly memorialized in September of 2013. (*See* Def. Mem. 5; Pl. Opp'n 3.)

[15] The parties assume without explicitly stating that New York law governs the exclusivity agreement. Because the parties appear to have orally discussed the exclusivity agreement at Plaintiff's New York office, (*see* Deposition of Steve Lewis ("Lewis Dep.") 116:2–7, Docket Entry No. 44-9), and the parties cite New York law in their papers, the Court applies

terms, there is no contract." *Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685, 696 (S.D.N.Y.

2015) (quoting *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 372 (2d Cir. 2003)).

"Whether there has been a meeting of the minds on all essential terms is a question of fact that

must be resolved by analyzing the totality of the circumstances." *Benicorp Ins. Co. v. Nat'l Med.

Health Card Sys., Inc.*, 447 F. Supp. 2d 329, 337 (S.D.N.Y. 2006) (citing *United States v. Sforza*,

326 F.3d 107, 116 (2d Cir. 2003)); *Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 378 F. Supp. 2d

377, 389 (S.D.N.Y. 2005) ("To determine the presence of mutual assent, . . . [t]he totality of the

parties' acts, phrases and expressions must be considered, along with the attendance

circumstances, the situation of the parties, and the objectives they were striving to attain."); *see

also Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008) (noting that where the evidence

"does not point unerringly in a single direction but is capable of supporting conflicting

inferences," the question of whether a contract has been formed "is a question of fact" (citation

omitted)). This rule applies unless "the evidentiary foundation for determining the formation of

the parties' contract is either undisputed or consists of writings," in which case contract

formation is a question of law for the court. *Vacold*, 545 F.3d at 123 (alterations and citations

omitted).

Once a court determines that a contract exists, it construes that contract "in accordance

with the parties' intent, which is generally discerned from the four corners of the document

_____

New York law to the dispute over the exclusivity agreement. *See Vacold LLC v. Cerami*, 545
F.3d 114, 122–23 (2d Cir. 2008) (holding that New York law applies where a substantial amount
of the conduct at issue underlying the contract-formation dispute occurred in New York and the
defendant raised no objection to the application of New York law); *see also Prince of Peace
Enters., Inc. v. Top Quality Food Market, LLC*, 760 F. Supp. 2d 384, 396 (S.D.N.Y. 2011)
(stating that under New York's choice-of-law rules, "the interpretation and the validity of
contracts are determined by the law of the place where the contract is made, while all matters
connected with its performance are regulated by the law of the place where the contract, by its
terms, is to be performed." (quoting *Auten v. Auten*, 308 N.Y. 155, 160 (1954))).

itself." *Luitpold Pharm., Inc. v. Ed Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015) (quoting *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009)); *see also O'Brien v. Argo Partners, Inc.*, 736 F. Supp. 2d 528, 534 (E.D.N.Y. 2010). "Only when a court finds ambiguity in the parties' written agreement may it look to extrinsic evidence to discern the parties' intent." *Id.* (quoting *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013)).

"Whether a contract is ambiguous in the first place presents a question of law." *N.Y. Univ. v. Galderma Labs, Inc.*, --- F. App'x ---, ---, 2017 WL 1491838, at *1 (2d Cir. Apr. 26, 2017) (quoting *Luitpold Pharm.*, 784 F.3d at 88); *see also Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002). Courts "analyze the ambiguity of a provision under the normal rules of contract interpretation: words and phrases should be given their plain meaning and a contract should be construed so as to give full meaning and effect to all of its provisions." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016) (internal quotation marks omitted); *see also Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 594 F. App'x 700, 702 (2d Cir. 2014) ("[I]f the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence." (quoting *Alexander & Alexander Servs., Inc. v. Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998))).

"A contract is ambiguous when its terms could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Utica*, 594 F. App'x at 703 (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)). Because "facial

ambiguity" in a contract requires the factfinder to examine extrinsic evidence to determine the contract's effect, "and because such extrinsic evidence is most often mixed," a court "generally will not grant summary judgment on a contract claim when the operative language is ambiguous." *Luitpold Pharm.*, 784 F.3d at 88 (citing *Compagnie Financiere de CIC et de L'union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157–58 (2d Cir. 2000)); *see also Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) ("Where contractual language is ambiguous and subject to varying reasonable interpretations, intent becomes an issue of fact and summary judgment is in appropriate. . . . Only where the language is unambiguous may the district court construe it as a matter of law and grant summary judgment accordingly."). No genuine dispute of fact exists, however, where "the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary," or "if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *Luitpold Pharm.*, 784 F.3d at 88 (citing *Compagnie Financiere*, 232 F.3d at 158). "Rather, in order for the parties' intent to become an issue of fact barring summary judgment, there must also exist relevant extrinsic evidence of the parties' actual intent." *Mellon Bank*, 31 F.3d at 116; *see also Williams & Sons Erectors v. S.C. Steel*, 983 F.2d 1176, 1183–84 (2d Cir. 1993) ("Ambiguity without the existence of extrinsic evidence of intent presents not an issue of fact, but an issue of law for the court to rule on.").

The Court finds that substantial ambiguity exists as to what the parties intended when they agreed that Plaintiff would receive a fifteen-cent discount upon having the MTA "consider" switching from CJ-4+Lubrizol to CJ-4+Infineum — namely, whether Plaintiff would receive a fifteen-cent discount upon obtaining a meeting with the MTA to discuss switching to

CJ-4+Infineum or upon actually convincing the MTA to place CJ-4+Infineum on its Qualified Products List.

The parties do not dispute that Plaintiff's managing member, Gary Stetz, and another principal, Joe Ioia, met with Curt Knapp and Steve Lewis, senior executives at Defendant's company, in or around September of 2013 to discuss the MTA contracts. (*See* Lewis Dep. 113:23–114:8, Docket Entry No. 44-9.) That meeting took place at Plaintiff's offices in New York. (*Id.*) A single email dated September 9, 2013, appears to memorialize the parties' oral agreement that day. (*See* Email dated Sept. 9, 2013 at 1, Docket Entry No. 44-4.) In it, Stetz writes to Lewis that he wanted to "confirm a few items":

> First, and in regard to the EcoPower CJ-4 with Lubrizol additive that we are about to supply [the MTA] under contract. It is my understanding that our price for the duration of the contract will be $5.65 per gallon delivered. Thus allowing us a $.49 per gallon gross margin . . . until such time that we facilitate a meeting with [the MTA] regarding the adding of the EcoPower CJ-4 with Infineum additive to their Qualified Product List ("QPL"). Upon facilitating such meeting, our price on the EcoPower CJ-4 with Lubrizol additive drops to $5.50 per gallon delivered. I have initiated that process and I will communicate with Mr. Knapp later today as to the status.

(*Id.* at 2.) In response, Lewis tells Stetz that he will "need to discuss these points with Curt Knapp and Mike Smith this week during our man[a]ger meetings in Dallas. . . . I will follow up with you next week." (*Id.* at 1–2.) Stetz thanks Lewis, and, as a follow-up, Knapp replies to the group that his recollection is that Defendant gave Plaintiff "two options," and that as part of one of them, "[w]e would switch to Infineum for both [the MTA and other customer] once we got [the MTA] to agree to switch. This would allow you to store and ship just one product for both [the MTA] and [the other customer]." (*Id.* at 1.)

Nevertheless, the relevant executives from each party appear to remember the agreement and how it was relayed to them in slightly different ways. In his deposition, Lewis

acknowledged that the oral agreement was accurately memorialized in Stetz's email on September 9, 2013.[16]  (Lewis Dep. 114:9–12.)  Separately, Stetz testified at his deposition that the agreement was for Plaintiff to "get [the MTA] to consider the change, get a meeting, and [Knapp] would give me [fifteen] cents retroactively a gallon rebate.  Because I was paying 5.65, he would retroactively reduce the price to 5.50 once I got the City to consider using Infineum."  (Stetz Dep. 64:9–15.)  In the same deposition testimony, however, Stetz acknowledges that on June 7, 2013, Knapp wrote, "I'm thinking we go with 5.65 to you now, and we will drop it to 5.50 when we get Infineum approved (doesn't need to be shipped; as long as we get a green light to eventually convert.)"[17]  (*Id.* at 74:20–75:5.)  Stetz again refers to the agreement as having

---

[16]  Lewis testified:

> Q:  A few moments ago we talked about a [fifteen]-cent credit.  Can you explain to me how the [fifteen]-cent credit was going to be applied?
>
> A:  It would be applied based on them obtaining the meeting, and we would look at the gallons.  It wasn't going to be something, as I understood, that was effective from the beginning of time, but it was a credit that would be applied going forward.
>
> Q:  Is it accurate to say that the credit would apply from the date on which the meeting with the MTA took place?
>
> A:  I'm not sure specifically.  I know Curt — I don't think it was ever really clear, but I knew it wasn't going back to the beginning of time when we started . . . .
>
> [ . . .]
>
> Q:  The credit would be due upon [Plaintiff] getting a meeting with someone from the MTA to discuss Infineum, not getting it placed on the [Qualified Products List]?
>
> A:  Correct.

(Lewis Dep. 118:10–25, 119:13–17.)

[17]  The parties do not appear to have provided the relevant email as part of the record on summary judgment.

imposed on Plaintiff an obligation to have the MTA "consider" using CJ-4+Infineum in lieu of CJ-4+Lubrizol. (*Id.* at 77:5–12.)

Knapp explained in his deposition that he intended that "if we got [CJ-4+Infineum] approved by New York City to — if we got an Infineum formulation approved for future bids on this specific product," (Deposition of Curt Knapp ("Knapp Dep.") 35:3–7, Docket Entry No. 39-14), then Defendant would provide the fifteen-cent rebate or discount:

> Q: And when you say 'approved' do you mean that the city of New York would add . . . CJ-4+Infineum to its qualified products list?
>
> A: Correct.
>
> Q: Do you know if that ever happened?
>
> Do you know if the agreement referenced in the email . . . regarding the [fifteen]-cent credit was ever modified so that the obligation on the part of [Plaintiff] would no longer be to place CJ-4+Infineum on the [Qualified Products List] but instead to get a meeting with representatives from the MTA to discuss adding CJ-4+Infineum on the [Qualified Products List]?
>
> A: That — in my mind, that was absolutely not the requirement. The requirement was to get an approval for us to be able to bid it.

(*Id.* at 35:8–25.)

Consistent with Knapp's interpretation of the oral agreement, an email from Defendant's executive Mike Smith to Stetz on April 24, 2014 reads, in relevant part:

> You were to send Curt [Knapp] and I the documentation on his commitment on the .15/gallon to get them to switch from Lubrizol to Infineum. You and Curt were not in agreement on the .15/gallon being retroactive back to Step. And he believes his commitment was to provide the incentive to get the conversion done, so we could both get improved margins on the business. The idea was to share the benefit of our additive saving with you once the switch to Infineum occurred. Do you have documentation stating otherwise? If not, the .15/gallon will be paid once we get the formulation change savings on gallons moving forward.

(Email dated Apr. 24, 2014 at 3, Docket Entry No. 44-7.)

Similarly, another email from Smith on May 1, 2014, to his colleagues, states, among other things:

> Curt [Knapp] agreed to the .15 but Gary [Stetz] told us the conversion [from CJ-4+Lubrizol to CJ-4+Infineum] was happening. If it hasn't, then we shouldn't pay it. Getting it converted for the next bid and retroactively paying them for the entire period while we lose was not Curt's intention. At the end of the day, we will consider paying this when the new bid specs come out and it doesn't require Lubrizol. Tell Gary this has to be the case before we pay him.

(Email dated May 1, 2014 at 1, Docket Entry No. 44-9.) Earlier in the same email thread, another Safety-Kleen employee attempts to document his understanding of the dispute with Plaintiff by noting:

> [Plaintiff] is claiming we committed to them that we would rebate up to $0.15/gallon on the [MTA] volume if they _tried_ to convert it to the Infineum formula . . . [but] those on the conference call do not remember such a commitment . . . [and it is] more likely that we'd rebate them $0.15/gallon on every gallon of non-Lubrizol CJ-4 they sold to [MTA].

(_Id._ at 3.)

Finally, in an August 22, 2014 letter from Stetz to Defendant's representatives, Stetz lists, among other grievances, that "in August 2013, Mr. Curt Knapp had come to our offices to meet with us. During one of many conversations, he had requested that we get [the MTA] to request the Infineum additive in place of the Lubrizol additive." (Letter dated Aug. 22, 2014 at 4, Docket Entry No. 39-4.)

Based on the evidence before the Court, the parties clearly disagree about whether Plaintiff was obligated only to set up a meeting with the MTA to discuss the formulation switch, or whether Plaintiff was obligated to set up a meeting as part of an effort to obtain access to the Qualified Products List, at which point Defendant would provide the fifteen-cent rebate on the existing CJ-4+Lubrizol contract. Neither interpretation is unreasonable, and it is not the Court's

role on summary judgment to weigh the extrinsic evidence to determine which interpretation better captures the parties' intent in September of 2013. *See Utica*, 594 F. App'x at 703 (explaining that a phrase is ambiguous where it "suggest[s] more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business" (citation and internal quotation marks omitted)).

The Court finds the exclusivity agreement ambiguous as a matter of law. Because the evidence "does not point unerringly in a single direction but is capable of supporting conflicting inferences," the question of whether the parties formed a contract with such substantial ambiguity that may have precluded a meeting of the minds is a question of fact for the jury. *See Vacold*, 545 F.3d at 123. Accordingly, the Court denies Defendant's motion for summary judgment as to the breach of the exclusivity agreement and the breach of the implied exclusivity agreement claims, counts one and five. *See Palmieri*, 445 F.3d at 187 ("Where contractual language is ambiguous and subject to varying reasonable interpretations, intent becomes an issue of fact and summary judgment is in appropriate.); *Proteus Books Ltd. v. Cherry Lane Music Co., Inc.*, 873 F.2d 502, 509 (2d Cir. 1989) (noting that where the district court found that a phrase was ambiguous as a matter of law, "[t]he interpretation of the phrase was . . . a question for the jury").

### ii. Implied covenant of good faith and fair dealing

Plaintiff's claims in counts two and six of the SAC, breach of the implied covenant of good faith and fair dealing as to the exclusivity agreement and the implied exclusivity agreement, state that Defendant withheld technical data and "other information" from Plaintiff in

bad faith in order to undermine Plaintiff's attempt to obtain MTA acceptance of a bid for CJ-4+Infineum.  (*Id.* ¶¶ 70–74, 80–86.)

Defendant argues that because the implied covenant claims arise from the exclusivity agreements, "[t]hese counts necessarily fail because there was never an enforceable agreement in the first instance."  (Def. Mem. 7.)  Plaintiff argues that there is a genuine issue of fact that precludes summary judgment on both breach of contract claims and, as a result, the implied covenant claims.  (Pl. Opp'n 13–14.)

"'[T]he covenant of good faith and fair dealing is implicit in every contract' under New York law . . . ."  *Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, 552 F. App'x 13, 16 (2d Cir. 2014) (alteration in original) (quoting *Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 529 (2d Cir. 2005)).  "The implied covenant of good faith and fair dealing prevents any party from doing 'anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  *Gaia House Mezz LLC v. State St. Bank & Trust Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)).  "In order to find a breach of the implied covenant, a party's action must 'directly violate an obligation that may be presumed to have been intended by the parties.'"  *Gaia House Mezz*, 720 F.3d at 93 (quoting *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407–08 (2d Cir. 2006)); *see also Thyroff*, 460 F.3d at 407 ("However, this covenant only applies where an implied promise is so interwoven into the contract 'as to be necessary for effectuation of the purposes of the contract.'" (quoting *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990))).  A court must examine "not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties."  *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) (citation omitted).

"Thus, whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." *Id.* (citation omitted).

In addition, a claim for breach of the implied covenant can only lie where it "relates to the performance of obligations under an extant contract." *Ray Legal Consulting Grp. v. DiJoseph*, 37 F. Supp. 3d 704, 727 (S.D.N.Y. 2014) (quoting *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 941 (2d Cir. 1998)). Because a breach of the implied covenant is "merely a breach of the underlying contract," there can be no breach "without a governing valid contract." *Kapsis v. Am. Home Mortg. Servicing, Inc.*, 923 F. Supp. 2d 430, 452 (E.D.N.Y. 2013) (first quoting *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992); and then quoting *Garrett v. Music Publ'g Co. of Am., LLC*, 740 F. Supp. 2d 457, 463 (S.D.N.Y. 2010)).

However, "New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Galderma Labs.*, --- F. App'x at ---, 2017 WL 1491838, at *3 (quoting *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013)). "Therefore, when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." *Id.* (quoting *Cruz*, 720 F.3d at 125).

Plaintiff's claims for breach of the implied covenant of good faith and fair dealing in counts two and six are based on the same underlying facts as Plaintiff's breach of contract claims alleged in counts one and five of the SAC, except that Plaintiff's good-faith-and-fair-dealing claims additionally alleged that Defendant "withheld technical data and other information from

Plaintiff in order to undermine Plaintiff's effort to obtain [MTA] acceptance of a bid." (*See* SAC ¶¶ 59–65, 80–86.) As to all other allegations but those relating to the technical data, the Court grants Defendant's motion for summary judgment because Plaintiff's implied covenant claims are duplicative of its contract claims. *See Galderma Labs.*, --- F. App'x at ---, 2017 WL 1491838, at *3. As to the allegations that Defendant breached the implied covenant of good faith and fair dealing by withholding technical data relating to the MTA bid, the Court denies Defendant's motion because disputed issues of fact exist regarding whether the parties had a valid and enforceable contract for exclusive price support and, if so, whether Defendant complied with its duties under that contract. *See Kapsis*, 923 F. Supp. 2d at 452; *see also FCOF UB Secs. LLC v. MorEquity, Inc.*, 663 F. Supp. 2d 224, 232 (S.D.N.Y. 2009) (collecting cases).

### iii. Promissory estoppel

Plaintiff alleges in count seven of the SAC that Defendant made a "clear and unambiguous promise" to Plaintiff that Defendant would provide exclusive "price support," or preferred pricing, for sales of Defendant's product to the MTA, as well as a price discount on Defendant's product, "in exchange for Plaintiff's obtaining consideration of CJ-4+Infineum for the [MTA] Qualified Product List." (SAC ¶ 88.) In reliance on that promise, Plaintiff persuaded the MTA to "entertain CJ-4+Infineum as a viable product for purchase," but Defendant failed to provide the exclusive "price support" on sales to the MTA or the price discount on Defendant's product. (*Id.* ¶¶ 89–90.)

Defendant argues that Plaintiff cannot recover under a theory of promissory estoppel because Plaintiff has not "pointed to any expenditure made in reliance" on Defendant's alleged promise of exclusivity or price support. (Def. Mem. 7.) Plaintiff argues that Stetz testified in his deposition that Plaintiff devoted time, money and resources to facilitating Plaintiff's meeting

with the MTA, and that Stetz will be able to quantify those amounts at trial. (Pl. Opp'n 16–17.) In addition, Plaintiff argues that it may be entitled to benefit-of-the-bargain damages — that is, the amount that Plaintiff would have received had Defendant kept its promise. (*Id.* at 17–18.)

"A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance." *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000); *Cacchillo v. Insmed, Inc.*, 551 F. App'x 592, 594 (2d Cir. 2014) (stating elements); *Dumont v. Litton Loan Servicing, LP*, No. 12-CV-2677, 2014 WL 815244, at *9 (S.D.N.Y. Mar. 3, 2014) (same); *Picini v. Chase Home Fin. LLC*, 854 F. Supp. 2d 266, 275 (E.D.N.Y. 2012) (same). "A promissory estoppel claim is duplicative of a breach of contract claim unless the plaintiff alleges that the defendant had a duty independent from any arising out of the contract." *Benefitvision Inc. v. Gentiva Health Servs., Inc.*, No. 09-CV-0473, 2014 WL 298406, at *9 (E.D.N.Y. Jan. 28, 2014) (alteration and internal quotation marks omitted) (quoting *Underdog Trucking, LLC, Reggie Anders v. Verizon Servs. Corp.*, No. 09-CV-8918, 2010 WL 2900048, at *6 (S.D.N.Y. July 20, 2010)); *Bd. of Trs. ex rel. Gen. Ret. Sys. of Detroit v. BNY Mellon, N.A.*, No. 11-CV-6345, 2012 WL 3930112, at *6 (S.D.N.Y. Sept. 10, 2012) ("[A] valid and enforceable contract precludes recovery in quasi-contract for all matters covered by the contract." (citing *Kwon v. Yun*, 606 F. Supp. 2d 344, 368 (S.D.N.Y. 2009))).

Here, Plaintiff's claim for promissory estoppel fails, and the Court therefore grants Defendant's motion for summary judgment as to this claim. If a factfinder determines that the exclusivity agreement constituted a "valid and enforceable contract" in that the parties had a meeting of the minds, that contract precludes Plaintiff's recovery for promissory estoppel, which

is based on the same price support and exclusivity as outlined in the contract. *See BNY Mellon*, 2012 WL 3930112, at *6.

However, even if the exclusivity agreement is determined not to have established a valid and enforceable contract, Plaintiff nevertheless fails to meet a necessary element of a promissory estoppel claim as a matter of law[18] because Plaintiff has failed to offer any evidence that it was injured in reliance on Defendant's alleged promise.[19] In deciding what type of damages are

---

[18] As the Court explained in connection with the breach of contract claims above, it is not apparent that Defendant's promise was "clear and unambiguous" — in fact, at least as to the offer and acceptance necessary to form a meeting of the minds, the Court holds as a matter of law that the contract was ambiguous. Although it does not necessarily follow that Defendant's promise was too ambiguous or insufficiently definite to support a claim of promissory estoppel, *see Brooks v. Aon Corp.*, 128 F. App'x 807, 808 (2d Cir. 2005) (noting that, at least under Connecticut law, the promise to support a claim of promissory estoppel need not necessarily be of the specificity that would support an oral contract), the Court notes that to the extent that a rational juror determines that the contract is unenforceable for lack of mutual assent, the reasonable predicate finding is that the terms were not clear and unambiguous, *see Cacchillo*, 551 F. App'x at 594; *see also Cohen v. Lehman Bros. Bank, FSB*, 273 F. Supp. 2d 524, 529 (S.D.N.Y. 2003) (finding that where the defendant said it would "work through" the issues plaintiffs raised with the deal and neither party could remember specifically what was said, the statements "[could not] be construed as a clear and unambiguous promises"); *cf. Bunkoff Gen. Contractors, Inc. v. Dunham Elec., Inc.*, 753 N.Y.S.2d 156, 158 (App. Div. 2002) (denying summary judgment on promissory estoppel claim because "questions of fact exist concerning whether [the] defendant indeed made a clear and unambiguous promise to [the] plaintiff when it submitted its quote").

[19] Indeed, it is not clear to the Court that Defendant failed to reimburse Plaintiff for approximately $23,000 in expenses, and, based on the record before the Court, it appears that this was the full amount Plaintiff requested as a benefit of its bargain with Defendant. (*See, e.g.*, Email from Gary Stetz to Mike Smith dated Apr. 24, 2014,Docket Entry No. 44-13 ("Dear Mike, See email chain below. The purpose of the $.15 per gallon credit was to motivate us to persuade NYC/MTA to drop their exclusive request for Lubrizol additive. I don't think that you need me to remind you that the eliminating [sic] the need for Lubrizol additive is very beneficial to Safety-Kleen . . . ."); *see also* Email from Mike Smith to Gary Stetz et al. dated Apr. 24, 2014, Docket Entry No. 44-13 ("Gary's request is $22,716.45 to cover the .15/gallon retroactive back to the beginning of the bid. Approved to process once you've [verified] the gallons are correct."); *see also* Email from Mike Smith dated Apr. 29, 2014, Docket Entry No. 44-9 ("As we know, we wrote [Plaintiff] a credit for $23K for converting the additive from Lubrizol to Infineum. When will they be taking the new formulated product? We obviously need to start realizing the benefits of the cost savings as soon as possible.").)

available to a plaintiff when no contract or meeting of the minds was formed, the New York

Supreme Court, Appellate Division, has held that "where the underlying agreement fails," the

doctrine of promissory estoppel is not being used "defensively in support of contract rights" but,

instead, to create "a new right in the interests of justice" with relief designed to achieve equity.

*Clifford R. Gray, Inc. v. LeChase Const. Servs.*, 857 N.Y.S.2d 347, 350 (App. Div. 2008).

"Under these circumstances [the] plaintiff 'is not entitled to the benefit of the bargain because

there was no bargain'" — the plaintiff is entitled only "to those expenses that [the] plaintiff

incurred in relying on [the] defendant's alleged promise." *Id.* (quoting Restatement (Second) of

Contracts § 90, cmt. d, illus. 8, 12 (Am. Law Inst. 1981)).  There is no evidence in the record to

support Plaintiff's allegation that it incurred any expenses when, in reliance on Defendant's

alleged promise of a rebate, Plaintiff facilitated a meeting with the MTA to discuss accepting CJ-

4+Infineum.  (*See* SAC ¶ 91.)  Accordingly, the Court grants Defendant's motion for summary

judgment on Plaintiff's claim for promissory estoppel.

### iv.  Fraud

Plaintiff alleges in count nine of the SAC that Defendant "misrepresented to Plaintiff" in

"numerous telephone conversations and in e-mail correspondence" between September of 2013

and January of 2014 that, "in exchange for Plaintiff's obtaining consideration of CJ-4+Infineum

for the [MTA] Qualified Products List," (1) Defendant would provide exclusive price support for

sales of Defendant's product to New York City as well as a price discount and (2) Plaintiff

would be the exclusive distributor of Defendant's products to New York City.  (SAC ¶¶ 103–04.)

Defendant argues that Plaintiff's fraud claim is duplicative of its breach of contract claim

because the misrepresentations supporting the fraud claim "include only purported statements by

[Defendant's] representatives promising that they would perform on various alleged contracts

identified by Plaintiff." (Def. Mem. 9.) Plaintiff argues that its fraud claim falls within an exception to the general rule that fraud claims cannot be based on misrepresentations duplicative of a contract claim — namely, the exception that permits fraud claims collateral to a contract. (Pl. Opp'n 19.)

Under New York law, fraud requires proof of "(1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 170 (2d Cir. 2015) (citing *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009)). A plaintiff may bring "parallel fraud and contract claims . . . if the plaintiff (1) demonstrates a legal duty separate from the duty to perform under the contract; (2) points to a fraudulent misrepresentation that is collateral or extraneous to the contract; or (3) seeks special damages that are unrecoverable as contract damages." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007) (citing *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996)). "New York distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of present fact that gives rise to a separate cause of action" for fraud. *Id.*

"A cause of action for fraud does not arise, where the only fraud alleged merely relates to a contracting party's alleged intent to breach a contractual obligation." *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 91 (2d Cir. 2005) (alterations and internal quotation marks omitted) (quoting *Caniglia v. Chicago Tribune–N.Y. News Syndicate, Inc.*, 612 N.Y.S.2d 146, 147 (App. Div. 1994)); *see id.* (finding that because the alleged collateral aims were "allegations about defendants' states of minds used to support the contention that they intended to breach the

contract (i.e. the motives for the breach)," the plaintiff's claim for fraud was "insufficiently distinct from the breach of contract claim to be viable"); *see also Bridgestone/Firestone*, 98 F.3d at 19 ("However, these facts amount to little more than intentionally-false statements by [the defendant] indicating his intent to perform under the contract. That is not sufficient to support a claim of fraud under New York law."); *Contemporary Mission, Inc. v. Bonded Mailings, Inc.*, 671 F.2d 81, 85 (2d Cir. 1982) (holding that "[i]f the only interest involved . . . is holding a party to a promise, a plaintiff will not be permitted to transform the contract claim into one for tort"); *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 309 (1995) (finding  a plaintiff's allegations insufficient to support a claim for fraud where the plaintiff alleged that the defendant allegedly entered into a contract while lacking the intent to perform it); *McKernin v. Fanny Farmer Candy Shops, Inc.*, 574 N.Y.S.2d 58, 59 (App. Div. 1991) (holding that where a fraud claim "is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie"); *cf. Merrill Lynch*, 500 F.3d at 183 (holding that a fraud claim was not duplicative of a warranty claim because the defendant's allegations "involve[d] misstatements and omissions of present facts, not contractual promises regarding prospective performance"); *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986) (refusing to dismiss a fraud claim alleging "a misrepresentation of present fact, not of future intent" which misrepresentation was "collateral to, but which was the inducement for the contract" and thus not duplicative of contract claim (citations and internal quotation marks omitted)).

Here, at least part of Plaintiff's fraud claim must be dismissed because it is duplicative of Plaintiff's breach of contract claim. Contrary to Plaintiff's contention that its fraud claim is

"collateral to" the breach of contract claim, Plaintiff's fraud claim rests on two alleged misrepresentations: first, that Defendant misrepresented it would provide exclusive price support for sales of its product to New York City and a rebate in exchange for Plaintiff's "obtaining consideration" of CJ-4+Infineum from the MTA; and second, that Plaintiff would be the exclusive distributor of Defendant's products to New York City. (SAC ¶¶ 103–04.) At least the first of these alleged misrepresentations is entirely subsumed within Plaintiff's breach-of-contract claim based on the exclusivity agreement and thus cannot form the basis of Plaintiff's fraud claim.[20] (*See id.* ¶¶ 39–49, 57.) Plaintiff is correct that, to the extent that Defendant misrepresented that it would provide exclusive price support and a rebate, it was not merely breaching its contract, (Pl. Opp'n 20); nevertheless, even Plaintiff's characterization of Defendant's actions — as having "induced [Plaintiff] to take action based upon an understanding that it would enjoy 'exclusive price support,'" (*id.*) — "amount to little more than intentionally-false statements" indicating Defendant's intent to perform under the contract, *see Bridgestone/Firestone*, 98 F.3d at 19. "This is not sufficient to support a claim of fraud under New York law." *See id.*; *see also TVT Records*, 412 F.3d at 91 (finding that because the alleged collateral aims were "allegations about defendants' states of minds used to support the contention that they intended to breach the contract (i.e. the motives for the breach)," the

---

[20] Plaintiff attempts to circumvent this reality by arguing that it has "cited to numerous representations made by [Defendant's] representatives" that Plaintiff should "expand its business" based on "promises that [Defendant] and [Plaintiff] would be 'strategic partners'" when it did not intend to continue the "strategic partnership," and that Defendant "never intended to provide [Plaintiff] with the CJ-4+Infineum technical data required by the MTA." (Pl. Opp'n 20.) However, Plaintiff does not make these allegations in the SAC to support its fraud claim, and it cannot now amend its pleadings through its opposition papers. *See Vioni v. Providence Inv. Mgmt., LLC*, 648 F. App'x 114, 117 (2d Cir. 2016); *see also Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (collecting cases recognizing that a party "is not entitled to amend its complaint through statements made in motion papers").

plaintiff's claim for fraud was "insufficiently distinct from the breach of contract claim to be viable").

As to the second alleged misrepresentation — that Plaintiff would be the exclusive distributor of Defendant's products to New York City — Plaintiff's claim fails because there is no evidence from which a factfinder could reasonably find in Plaintiff's favor as to Defendant's knowledge of falsity at the time of the promise and Defendant's intent to induce Plaintiff's reliance. *See Loreley Fin.*, 797 F.3d at 170 (listing elements of fraud as "(1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages"). The Court has thoroughly examined the record and has neither found nor been directed to evidence that supports elements two or three of Plaintiff's fraud claim based on Defendant's alleged promise that Plaintiff would be the exclusive distributor of Defendant's products to New York City. Indeed, there is little evidence to support Plaintiff's contention that Defendant promised exclusive distribution for New York City bids. (*See* Email from Gary Stetz to Curt Knapp dated Sept. 23, 2013, Docket Entry No. 44-1 ("I probably should not have used the word 'exclusive.' What we had asked for was to be the Safety Kleen authorized distributor in the New York Metropolitan area for all your Buyback business in our market and to be the sole bidder for government contracts in our market."); *id.* ("OK. We can make that happen. But do know that if/when we make that switch, we could lose . . . another supplier as retribution. That's why I want to a shot [sic] at your PL volume; let's see if it is something we want/can be competitive on at acceptable margins for us.").)

Without any evidence of Defendant's knowledge that its promise was false at the time it was made or Defendant's intent to induce Plaintiff's reliance on that promise, there is no genuine

dispute as to any material fact, and Defendant is entitled to summary judgment on Plaintiff's fraud claim.

### v. Tortious interference

Plaintiff alleges in counts ten and eleven of the SAC that Defendant agreed to provide Plaintiff exclusive pricing support in connection with Plaintiff's bids to New York City and then "purposely failed and refused to provide the technical data and endorsements" needed to obtain the MTA's approval of CJ-4+Infineum for its Qualified Product List. (SAC ¶¶ 113–15, 125–27.) Plaintiff also alleges that at the same time, Defendant "surreptitiously supported the bids of other distributors" and "communicated with one or more agencies or departments of the City of New York in an attempt to interfere with Plaintiff's ability to act as a distributor of oil to New York City and its agencies." (*Id.* ¶¶ 116–17, 128–29.)

Defendant argues that, as to the claim for tortious interference with contract, Plaintiff has not identified any contract with which Defendant allegedly interfered. (Def. Mem. 9–10.) As to the claim for tortious interference with prospective economic advantage, Defendant argues that Plaintiff has not identified any malicious or unfair conduct that Defendant directed at a third party. (*Id.* at 11.)

Plaintiff argues as to both claims that Defendant had knowledge that Plaintiff "had contracts with its customers to supply them with [Defendant's] product," and "was aware that if it withheld [its] product from [Plaintiff], [Plaintiff] would be unable to fulfill its obligations with its customers." (Pl. Opp'n 21.)

### 1. Tortious interference with contract

Under New York law, the elements of tortious interference with contract are "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's

knowledge of the contract; (3) the defendant's intentional procurement of the third-party's

breach of the contract without justification; (4) the actual breach of the contract; and (5) damages

resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (internal

quotation marks omitted) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424

(1996)).

As relevant here, a plaintiff must identify the specific third-party contract with which the

defendant allegedly interfered. *See Valley Lane Indus. Co. v. Victoria's Secret Direct Brand

Mgmt., LLC*, 455 F. App'x 102, 104 (2d Cir. 2012) (dismissing a tortious interference with

contract claim because the plaintiff's allegation that it had a "long-standing agreement [with the

third party] to produce shoes for [the defendant] and other customers" failed to "plausibly plead

the existence of a contractual relationship"); *Katz v. Travelers*, --- F. Supp. 3d ---, ---, 2017 WL

1317000, at *7–8 (E.D.N.Y. Mar. 10, 2017) (dismissing the plaintiffs' tortious interference with

contract claim where the complaint "merely state[d] that 'insurance carriers and third party

independent medical companies terminated and/or suspended their contractual relationship with

[the plaintiffs] based on the false and misleading statements made by the [d]efendants'"

(collecting cases)); *Amto, LLC v. Bedford Asset Mgmt., LLC*, 168 F. Supp. 3d 556, 567–68

(S.D.N.Y. 2016) (dismissing a claim for tortious interference with contract where the plaintiff

did not show "the existence of a valid contract between the plaintiff and a third party" (citing,

*inter alia*, *Lama Holding Co.*, 88 N.Y.2d at 424)); *Mi-Kyung Cho v. Young Bin Café*, 42 F. Supp.

3d 495, 510 (S.D.N.Y. 2013) ("The record is devoid of any facts that even arguably suggest that

[the] plaintiff had a contract with a third party. This absence of a valid and enforceable contract

is fatal to [the] plaintiff's tortious interference with contract claim."); *Plasticware, LLC v. Flint

Hill Res., LP*, 852 F. Supp. 2d 398, 404 (S.D.N.Y. 2012) ("Plaintiff has not plausibly alleged

adequate details about a specific contract between itself and a third party, but merely has alleged that it has 'agreements' with its customers. This is insufficient."); *Bose v. Interclick, Inc.*, No. 10-CV-9183, 2011 WL 4343517, at *10–11 (S.D.N.Y. Aug. 17, 2011) (dismissing a tortious interference with contract claim where the plaintiff claimed that it had contracts with various parties, but did not give any "facts regarding the terms of the contracts or the specific parties to the contracts"); *Ho Myung Moolsan Co. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 255 (S.D.N.Y. 2009) (denying plaintiffs leave to amend a tortious interference with contract claim that the court dismissed, because plaintiffs alleged only that the "defendants interfered with their customer contracts" but did not "specify a single customer contract with which defendants interfered").

Plaintiff has failed to identify any contract between Plaintiff and a third party with which Defendant allegedly interfered. Even accepting as true Plaintiff's contentions that it "had contracts with its customers to supply them with [Defendant's] product," and Defendant "was aware that if it withheld [its] product from [Plaintiff], [Plaintiff] would be unable to fulfill its obligations with its customers," (Pl. Opp'n 21), Plaintiff neither identifies the contracts nor alleges that the third parties, as opposed to Plaintiff, breached those contracts. *See Valley Lane Indus.*, 455 F. App'x at 104.

From the evidence in the record, the Court can locate only one contract between Plaintiff and a third party: Plaintiff's contract with the MTA for the sale of CJ-4+Lubrizol. (*See* SAC ¶¶ 14, 39.) Plaintiff does not allege, nor is there any evidence, that the MTA breached its contract with Plaintiff. In sum, Plaintiff has not identified a contract with which Defendant allegedly interfered, but even if the Court assumes that the MTA CJ-4+Lubrizol contract is a relevant contract underlying Plaintiff's tortious interference claim, there is no evidence in the record that

the MTA breached the CJ-4+Lubrizol contract. *See Kirch*, 449 F.3d at 402 (finding that a failure to prove breach by the third party is fatal to tortious interference with contract claim). The Court therefore grants Defendant's motion for summary judgment on Plaintiff's claim for tortious interference with contract.

### 2. Tortious interference with prospective economic advantage

In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must allege that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair or improper means; and (4) the defendant's interference caused injury to the relationship." *Kirch*, 449 F.3d at 400; *Ace Arts, LLC v. Sony/ATV Music Publ'g, LLC*, 56 F. Supp. 3d 436, 452 (S.D.N.Y. 2014) (internal quotation marks omitted) (quoting *Kirch*, 449 F.3d at 400). The elements of tortious interference with prospective economic advantage are similar to those of tortious interference with contract, except that "the defendant's conduct must be more culpable for a claim of tortious interference with a prospective contract." *Ace Arts*, 56 F. Supp. 3d at 452 (quoting *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 520 (S.D.N.Y. 2011) (quoting *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (1980))).

"The New York Court of Appeals has explained that, 'as a general rule, a defendant's conduct must amount to a crime or an independent tort' in order to amount to tortious interference with a prospective economic advantage.'" *Friedman v. Coldwater Creek, Inc.*, 321 F. App'x 58, 60 (2d Cir. 2009) (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004)). "A defendant who has not committed a crime or independent tort or acted solely out of malice may nevertheless be liable if he has employed 'wrongful means,'" which include "physical violence,

fraud or misrepresentation, civil suits and criminal prosecutions" and "extreme and unfair economic pressure." *Id.* (internal quotation marks and citations omitted). If the defendant's "motive in interfering . . . was normal economic self-interest," the defendant did not use unlawful means. *Carvel*, 3 N.Y.3d at 190.

In addition, "conduct constituting tortious interference [with prospective economic advantage] is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a business relationship." *Carvel*, 3 N.Y.3d at 192 (collecting cases); *see also Valley Lane*, 455 F. App'x at 107 (holding that the plaintiff's allegations regarding the defendant's tortious conduct "also fail because there is no allegation that this conduct — which was undisputedly directed at [the plaintiff] — proximately caused [the third party] to sever its business relationship with [the plaintiff]"); *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 768 (2d Cir. 1995) (dismissing a tortious interference claim because alleged conduct was not directed at the plaintiff's customers); *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477, 482 (S.D.N.Y. 1997) ("Under New York law, in order for a party to make out a claim for tortious interference with prospective economic advantage, the defendant must . . . direct some activities toward the third party . . . .").

Plaintiff's claim for tortious interference with prospective economic advantage fails because there is no evidence that Defendant directed any improper or wrongful conduct toward a third party with which Plaintiff had an existing business relationship. Indeed, the only evidence in the record that Defendant contacted any third party with which Plaintiff had a business relationship is the January 21, 2015 email exchange in which Defendant informed DCAS, in response to a DCAS inquiry, that Plaintiff was no longer an authorized distributor of Defendant's products. (Def. 56.1 ¶¶ 23–24; *see* Email dated Jan. 21, 2015, Docket Entry No. 39-17.) The

communication occurred two months after Defendant sent Plaintiff a final demand letter and informed Plaintiff that its account would be moved to collection. (*See* Final Demand Letter dated Nov. 19, 2014, Docket Entry No. 39-13.) Plaintiff does not argue that this email was improper or wrongful, and the Court has found no evidence from which a rational juror would find for Plaintiff. Accordingly, the Court grants Defendant's motion for summary judgment on Plaintiff's claim for tortious interference with prospective economic advantage. *See Gun Hill Rd. Serv. Station, Inc. v. ExxonMobil Oil Corp.*, No. 08-CV-7956, 2013 WL 395096, at *16 (S.D.N.Y. Feb. 1, 2013) (finding that because the "plaintiffs point[ed] to no evidence in the record suggesting that [the defendant] acted with the sole purpose of harming [the plaintiffs]," there was "no genuine dispute that [the defendant] acted with a 'normal economic self-interest.'" (quoting *Carvel*, 3 N.Y.3d at 190)).

### vi. Declaratory judgment

Plaintiff requests a declaratory judgment in count twelve of the SAC "with respect to the validity and amount" of the charges arising from Defendant's sale of its product to Plaintiff and Plaintiff's dispute of the unpaid invoices. (SAC ¶¶ 136–40.)

Defendant argues that Plaintiff improperly seeks declaratory relief with respect to past actions, where declaratory relief is only appropriate for prospective rights and responsibilities. (Def. Mem. 13.) Plaintiff argues that parties routinely seek declaratory relief to determine their rights under contracts before and after breach, and because the amounts owed are in dispute, the Court should deny summary judgment on Plaintiff's declaratory judgment claim. (Pl. Opp'n 22–23.)

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations

of any interested party seeking such declaration, whether or not further relief is or could be sought." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007) (quoting 28 U.S.C. § 2201(a)); *see also* Fed. R. Civ. P. 57. The court retains "unique and substantial discretion in deciding whether to" issue declaratory relief. *Mariah Re Ltd. v. Am. Family Mut. Ins. Co.*, 52 F. Supp. 3d 601, 623 (S.D.N.Y. 2014) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)), *aff'd sub nom. Maria Re Ltd. ex rel. Varga v. Am. Family Mut. Ins. Co.*, 607 F. App'x 123 (2d Cir. 2015). In deciding "whether to entertain an action for declaratory judgment, [the Second Circuit has] instructed district courts to ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Id.* (quoting *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005)). However, "there is no basis for declaratory relief where only past acts are involved." *Id.* (citation omitted); *see also Adirondack Cookie Co. Inc. v. Monaco Baking Co.*, 871 F. Supp. 2d 86, 94 (N.D.N.Y. 2012) (dismissing a plaintiff's claim for declaratory judgement because the "plaintiff [wa]s not seeking prospective relief, but merely a declaration that its past 'inadvertent' use of the words 'Patent Pending' on its Cookie Bouquet Stand did not violate the False Marking Statute"); *S.E.C. v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376, 388–89 (S.D.N.Y. 2010) ("[D]eclaratory judgment is inappropriate where the moving party seeks to adjudicate past conduct.").

"The fact that a lawsuit has been filed that will necessarily settle the issues for which declaratory judgment is sought suggests that the declaratory judgment will serve no useful purpose." *Fleischer v. Phx. Life Ins. Co.*, 858 F. Supp. 2d 290, 302 (S.D.N.Y. 2012) (citation and internal quotation marks omitted). Thus, courts routinely dismiss requests for declaratory judgment when the parties' rights will be adjudicated through a breach of contract claim in the

same action. *See, e.g.*, *Target Corp. v. RichRelevance, Inc.*, No. 15-CV-6614, 2017 WL 590316, at *10 (S.D.N.Y. Feb. 13, 2017) (collecting cases); *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 472 (S.D.N.Y. 2014) (dismissing a claim for declaratory relief where the plaintiffs sought the same relief in their claim for breach of express warranty); *Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P.*, No. 08-CV-10578, 2010 WL 1257326, at *10–11 (S.D.N.Y. Mar. 12, 2010) (holding that where the plaintiffs brought breach of contract and quasi-contract claims, "a declaratory judgment announcing the terms of the fee-sharing agreement [was] unnecessary" because "the factual findings made as to each party's rights and liabilities . . . will necessary accomplish the purpose of a declaratory judgment by 'clarifying and settling the legal relations in issue' and 'afford[ing] relief from [the] uncertainty, insecurity, and controversy giving rise to the proceeding.'" (citation omitted)); *J.C. Penney Corp., Inc. v. Carousel Ctr. Co., L.P.*, 635 F. Supp. 2d 126, 135 (N.D.N.Y. 2008) (finding declaratory judgment "unnecessary and inappropriate" where the court's "resolution of [the plaintiff's] breach-of-contract claims regarding the methods used to calculate [the plaintiff's] past escalation payments will provide binding authority for the correct methods going forward"); *see also Apple Records, Inc. v. Capitol Records, Inc.*, 529 N.Y.S.2d 279, 281 (App. Div. 1988) (dismissing a declaratory judgment claim concerning the calculation of future payments where resolution of the breach-of-contract claims would "sufficiently guide the parties on their future performance of the contracts").

Here, Plaintiff seeks a declaratory judgment "with respect to the validity and amount of [the] disputed charges and whether and to what extent Plaintiff is responsible for same, if at all." (SAC ¶ 140(b).) The declaratory judgment Plaintiffs seek would "serve[] neither of the[] two objectives" of declaratory relief. *Dolphin Direct Equity Partners, LP v. Interactive Motorsports*

*& Entm't Corp.*, No. 08-CV-1558, 2009 WL 577916, at \*11 (S.D.N.Y. Mar. 2, 2009) (quoting

*Camofi Master LDC v. College P'ship, Inc.*, 452 F. Supp. 2d 462, 480 (S.D.N.Y. 2006)), *aff'd*,

419 F. App'x 60 (2d Cir. 2011). Because the Court is analyzing the parties' rights and

obligations under the Distributor Agreement and in connection with the agreements for

exclusivity and price support, as well as in the context of Defendant's counterclaims arising from

the same transactions, a declaratory judgment would serve no purpose. *See id.* (finding that,

where the court was already analyzing the parties' rights under various agreements, "a

declaratory judgment on the same issue[s] would be superfluous" (quoting *Core-Mark Int'l v.

Commonwealth Ins. Co.*, No. 05-CV-183, 2006 WL 2501884, at \*9 (S.D.N.Y. Aug. 30, 2006)));

*see also Mariah Re Ltd.*, 52 F. Supp. 3d at 623 ("[D]eclaratory relief in this case would be

wholly superfluous, as the resolution of [the plaintiff's] other claims would 'settle the issues for

which declaratory judgment is sought.'" (citation omitted)); *Miramax Film Corp. v. Abraham*,

No. 01-CV-5202, 2003 WL 22832384, at \*15 (S.D.N.Y. Nov. 25, 2003) ("The lawfulness of

defendants' actions will be determined by resolution of the contract claim. Hence, the

declaratory relief will serve no useful purpose.").

 The Court therefore grants Defendant's motion for summary judgment on Plaintiff's

claim for declaratory relief.

### vii. Breach of the Waste Oil Agreement

 Plaintiff alleges in count thirteen of the SAC that Defendant breached its obligations

under the Waste Oil Agreement by failing to pay commissions due to Plaintiff and wrongfully

attempting to repudiate the agreement by letter dated December 16, 2014. (SAC ¶¶ 142–43.)

 Defendant argues that the Court lacks jurisdiction over any claim for damages arising

from the Waste Oil Agreement because that agreement requires that disputes be arbitrated. (Def.

Mem. 13.)  In the alternative, Defendant argues that the Court should rule as a matter of law that

Plaintiff cannot recover for damages incurred on or after February 14, 2015, because the Waste

Oil Agreement permits termination by either party with sixty days' notice and Defendant

terminated the agreement by letter on December 14, 2014.  (*Id.* at 14.)  Plaintiff argues that

Defendant has waived its right to arbitration because it has filed responsive pleadings, deposed

several witnesses and conducted extensive document discovery since Plaintiff first asserted a

claim under the Waste Oil Agreement.  (Pl. Opp'n 24.)  Plaintiff also argues that damages should

not be limited through February 14, 2015 because document discovery has demonstrated that

Defendant "surreptitiously continued to collect waste oil from [Plaintiff's] customers, yet never

provided payment to [Plaintiff]" after that date.  (*Id.*)

"Federal policy strongly favors arbitration and waiver of a right to arbitrate is not lightly

inferred."  *Tech. in P'ship, Inc. v. Rudin*, 538 F. App'x 38, 39 (2d Cir. 2013).  "This preference

for arbitration '[h]as led to its corollary that any doubts concerning whether there has been a

waiver are resolved in favor of arbitration.'"  *PPG Indus., Inc. v. Webster Auto Parts, Inc.*, 123

F.3d 103, 107 (2d Cir. 1997) (quoting *Leadertex Inc. v. Morganton Dyeing & Finishing Corp.*,

67 F.3d 20, 25 (2d Cir. 1995)).  Nevertheless, "a party waives its right to arbitration when it

engages in protracted litigation that prejudices the opposing party."  *Tech. in P'ship*, 538 F.

App'x at 39 (quoting *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 162 (2d Cir. 2000)).

"The question of whether a party's pretrial conduct amounts to waiver of the defense of

arbitration is a legal question to be decided by the court."  *NV Petrus SA v. LPG Trading Corp.*,

No. 14-CV-3138, 2017 WL 1831096, at *3 n.3 (E.D.N.Y. May 4, 2017) (quoting *Burns v.

Imagine Films Entm't, Inc.*, 165 F.R.D. 381, 387 (W.D.N.Y. 1996) (citing *Leadertex*, 67 F.3d at

25)).

"In determining whether a party has waived its right to arbitration by expressing its intent to litigate the dispute in question," courts consider the following three factors: "(1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3) proof of prejudice." *Sutherland v. Ernst & Young, LLP*, 600 F. App'x 6, 7–8 (2d Cir. 2015) (internal quotation marks omitted) (quoting *La. Stadium & Expo. Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d Cir. 2010)). "There is no rigid formula or bright-line rule for identifying when a party has waived its right to arbitration; rather, the above factors must be applied to the specific context of each particular case." *Id.* (quoting *La. Stadium*, 626 F.3d at 159). However, "[t]he key to a waiver analysis is prejudice. Waiver of the right to compel arbitration due to participation in litigation may be found only when prejudice to the other party is demonstrated." *Id.* (quoting *Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102, 105 (2d Cir. 2002)); *see also Leadertex*, 67 F.3d at 25 ("Although litigation of substantial material issues may amount to waiver, delay in seeking arbitration does not create a waiver unless it prejudices the opposing party." (citations omitted)).

The Second Circuit has recognized "two types of prejudice: substantive prejudice and prejudice due to excessive cost and time delay." *Sutherland*, 600 F. App'x at 7–8 (citing *Thyseen*, 310 F.3d at 105); *O'meara v. Interpros, Inc.*, No. 16-CV-1840, 2017 WL 3140359, at *5–6 (D. Conn. July 24, 2017) (citing *Sutherland*, 600 F. App'x at 7–8). Substantive prejudice occurs "when a party loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration," and prejudice of excessive cost and time occurs "when a party too long postpones his invocation of his contractual right to arbitration, and thereby causes his adversary to incur unnecessary delay or expense." *Sutherland*, 600 F. App'x at 8 (quoting

*Kramer v. Hammond*, 943 F.2d 176, 179 (2d Cir. 1991)); *S&R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 83–84 (2d Cir. 1998) (explaining that prejudice has been found where "a party seeking to compel arbitration engages in discovery procedures not available in arbitration, makes motions going to the merits of an adversary's claims, or delays invoking arbitration rights while the adversary incurs unnecessary delay or expense" (citing *Cotton v. Slone*, 4 F.3d 176, 179 (2d Cir. 1993))); *see also NV Petrus SA*, 2017 WL 1831096, at *2–3 ("Prejudice 'refers to the inherent unfairness — in terms of delay, expense, or damage to a party's legal position — that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." (quoting *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 134 (2d Cir. 1997))). A court will not find waiver where "delay in trial proceedings was not accompanied by substantial motion practice or discovery." *Sutherland*, 600 F. App'x at 8 (quoting *Thyssen*, 301 F.3d at 105).

Plaintiff first added the Waste Oil Agreement claim in the SAC, which it filed August 13, 2015. (*See generally* SAC.) Defendant first raised the agreement's arbitration clause seven months later, on March 15, 2016, (*see* Def. Letter Requesting Pre-Mot. Conf., Docket Entry No. 28), and, at a pre-motion conference on June 14, 2016, the Court directed Defendant to brief the issue in its motion for summary judgment, (*see* Min. Entry dated June 14, 2016). During this seven-month period, the parties appear to have attempted to mediate and settle their claims and exchanged some document and deposition discovery. (*See* Docket Entry Nos. 15–27.) Defendant also filed an answer to Plaintiff's SAC without raising the issue of the Waste Oil Agreement's arbitration clause. (*See* Answer, Docket Entry No. 15.) None of this, however, is determinative, because the parties have not explained the nature of the discovery they exchanged between August of 2015 and March of 2016, whether it related to the Waste Oil Agreement,

whether such discovery would be available to them in arbitration, and what prejudice, if any,

Plaintiff would suffer should the Court decide to sever the Waste Oil Agreement claim and refer

it to arbitration.  Therefore, the Court reserves decision on Plaintiff's claim related to the Waste

Oil Agreement and instructs Plaintiff to submit a letter brief of no more than five pages, single-

spaced, within ten days of this Memorandum and Order, explaining any prejudice, with

Defendant's response due ten days thereafter.  *See Sutherland*, 600 F. App'x at 7–8 ("Waiver of

the right to compel arbitration due to participation in litigation may be found only when

prejudice to the other party is demonstrated.").

### c.   Summary judgment on Defendant's counterclaims

Defendant moves for summary judgment on its counterclaims for breach of contract and

unjust enrichment, arguing that there is no genuine issue of material fact that Plaintiff accepted

Defendant's product throughout 2014 under the Distributor Agreement and did not pay for that

product.  (Def. CC Mem. 4.)  Plaintiff argues that Defendant's contract claim fails because "no

enforceable contract existed" between the parties to govern Defendant's shipment of product,

Defendant's unjust enrichment claim fails because Defendant "seeks the wrong type of damages

in support of its claim," and, in any event, the parties dispute the amounts owed under

Defendant's 2014 invoices.  (Pl. CC Opp'n Mem. 1.)

### i.   Breach of contract

Defendant argues that pursuant to the APA, Plaintiff effectively "stepped into the shoes"

of NYCL and was obligated to purchase a minimum amount of Defendant's product each year

— and, in fact, that Plaintiff did continue to purchase Defendant's product throughout 2013 and

2014 as NYCL had under the Distributor Agreement.  (Def. CC Mem. 1–2; Def. CC 56.1 ¶ 12.)

However, Plaintiff failed to pay for the product Defendant shipped in 2014, and, according to

Defendant, Plaintiff owes $1,056,383.97 for that product and $314,083.77 in interest under the Distributor Agreement. (Def. CC Mem. 2.) In his deposition, Stetz admitted that Plaintiff received the products indicated in Defendant's invoices and sold the products to third parties, which Plaintiff does not dispute. (Def. CC 56.1 ¶¶ 14–15; Pl. CC 56.1 ¶¶ 14–15.) Plaintiff argues, however, that it was never assigned the Distributor Agreement under the APA with NYCL,[21] and, to the extent that it owes Defendant for the product shipped by Defendant, those charges should be offset, at a minimum, by the amounts Defendant owes Plaintiff under the exclusivity agreement and the Waste Oil Agreement. (Pl. CC Opp'n Mem. 2.)

As explained above, under New York law, a plaintiff alleging breach of contract must first show the existence of a contract. *See Hudson & Broad*, 553 F. App'x at 39 (listing elements). "Under both New York law and traditional common law, a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities," including contracts. *Byrd v. Repub. of Honduras*, 613 F. App'x 31, 33–34 (2d Cir. 2015) (quoting *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006)); *see also N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 227–28 (2d Cir. 2014) ("When a corporation purchases the assets of another corporation, it does *not* acquire its liabilities . . . ." (citing *Nat'l Serv. Indus.*, 460 F.3d at 209)).

However, "a buyer of a corporation's assets will be liable as its successor" if "(1) it

_____

[21] Defendant has not carried its burden on summary judgment to demonstrate that there is no issue of material fact regarding the existence of a contract. According to the language of the APA, Plaintiff purchased from NYCL certain contracts "specifically identified on Schedule 1.1(b)," which neither party appears to have included in the record on summary judgment. (APA at 3.) Moreover, Defendant does not argue that the Distributor Agreement was included on Schedule 1.1(b). The Court is therefore unable to determine whether the Distributor Agreement was explicitly transferred as part of NYCL's asset sale to Plaintiff, but because this fact is not disputed by Defendant, the Court accepts Plaintiff's assertion that the Distributor Agreement was not explicitly transferred. (*See* Stetz Aff. ¶ 8.)

expressly or impliedly assumed the predecessor's . . . liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations." *Nat'l Serv. Indus.*, 460 F.3d at 209; *see also Byrd*, 613 F. App'x at 34 (quoting *Nat'l Serv. Indus.*, 460 F.3d at 209); *FirstEnergy Corp.*, 766 F.3d at 227–28 (quoting same). As relevant here, the second and third exceptions — the "de facto merger" and "mere continuation" exceptions, respectively — "are often regarded as so similar as to be considered a single exception."[22] *Douglas v. Stamco*, 363 F. App'x 100, 101–02 (2d Cir. 2010) (citing *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 n.3 (2d Cir. 2003)). The inquiry is whether "a transaction, although not in form a merger, is in substance a consolidation or merger of seller and purchaser." *Id.* (quoting *Nat'l Serv. Indus.*, 460 F.3d at 209).

Thus, to determine whether there has been a de facto merger or a mere continuation of a corporate entity for successor liability, a court considers whether there was: "(1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets and general business operation." *Id.* (quoting *Nat'l Serv. Indus*, 460 F.3d at 209). Although courts examine all factors, "continuity of ownership is the essence of a merger." *Id.* at 102 (quoting *Nat'l Serv. Indus.*, 460 F.3d at 211); *see also Nat'l Serv. Indus.*, 460 F.3d at 211 (concluding that there is no de facto merger where

---

[22] Although it is possible that Plaintiff "impliedly assumed" NYCL's liabilities, the Court construes Defendant's argument that Plaintiff "stepped into [NYCL's] shoes", (Def. CC 56.1 ¶ 5), to suggest that there was either a de facto merger or that Plaintiff is a mere continuation of NYCL.

there is no evidence of continuity of ownership because "the nature of an asset sale is that the seller's ownership interest in the entity is given up in exchange for consideration"); *see also Battino v. Cornelia Fifth Ave., LLC*, 861 F. Supp. 2d 392, 401 (S.D.N.Y. 2012) ("Here, there is no dispute that ownership of the business changed hands; thus, regardless of whether the other *de facto* merger factors are present, the *de facto* merger and 'mere continuation' exceptions do not apply."); *Kaur v. Royal Arcadia Palace, Inc.*, 643 F. Supp. 2d 276, 289 (E.D.N.Y. 2007) ("Under the common law mere continuation theory, successor liability attaches when the plaintiff demonstrates the existence of a single corporation after the transfer of assets, with an identity of stock, stockholders, and directors between the successor and predecessor corporations." (quoting *Graham v. James*, 144 F.3d 229, 240 (2d Cir. 1998))).

The successor issue is "highly fact-specific" and typically cannot be determined as a matter of law. *See Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 703 (2d Cir. 2009) (remanding for a determination of successor liability where the successor assumed control of the predecessor under a new name, "maintained a ninety percent ownership interest," "assumed operating control of the facilities and infrastructure improvements, as well as business channels, to deliver, without interruption, the same services," and maintained the same employees and management as well as equity ownership).

Here, Defendant has not demonstrated that there is no genuine issue of material fact as to Plaintiff's successor liability. Defendant states that Plaintiff "stepped into the shoes" of NYCL, "kept all the same employees, the same facility, the same equipment and the same website," and "purchased the right to use [NYCL's] commercial name, 'Metrolube.'" (Def. CC Mem. 1–2; Def. CC 56.1 ¶¶ 4–6.) Plaintiff states that it "purchased only certain assets" of NYCL and did not "step into [NYCL's] shoes." (Pl. CC 56.1 ¶ 5.) Neither party provides information

regarding the critical "continuity of ownership" element of successor liability, including any differences in the composition of NYCL's ownership, management, personnel and business operations after the APA. *See Nat'l Serv. Indus.*, 460 F.3d at 211. Defendant has therefore failed to show, as a matter of law, that Plaintiff was NYCL's successor for purposes of the Distributor Agreement. *See Byrd*, 613 F. App'x at 33–34 ("Finally, plaintiffs suggest, in passing, that [the predecessor] has *de facto* merged into [the defendant], but they offer no evidence or even argument to support that suggestion."); *Priestley v. Headminder, Inc.*, 647 F.3d 497, 506 (2d Cir. 2011) (holding that an allegation regarding "continuity of . . . officers," without sufficient facts to allege continuity of ownership, was insufficient to support claim of de facto merger); *Douglas*, 363 F. App'x at 102 (holding that no exception to successor liability applied to debts after bankruptcy asset sale because there was "no common identity among the [p]urchaser and the [d]ebtors' incorporators, officers, directors or material stockholders," and the predecessor entity survived the asset sale as a bankrupt entity); *105 Mt. Kisco Assocs., LLC v. Carozza*, No. 15-CV-5346, 2017 WL 1194700, at *12 (S.D.N.Y. Mar. 30, 2017) (finding that even where the plaintiffs asserted allegations of dissolution and continuity of management and business operations, they could not support a claim of de facto merger without facts to support continuity of ownership).

Accordingly, the Court denies Defendant's motion for summary judgment on its breach of contract claim.

### ii. Unjust enrichment

Defendant argues in the alternative that, if the Court finds that there was no contract in place between Plaintiff and Defendant, the Court should grant summary judgment on Defendant's claim for unjust enrichment as a result of Plaintiff's acceptance and resale of

Defendant's product without payment. (Def. CC Mem. 9.) Plaintiff argues that Defendant has improperly calculated its purported damages based on its own losses from the product, rather than by Plaintiff's gain, and that this "dooms [Defendant's] request for summary judgment." (Pl. CC Opp'n Mem. 19–20.)

"The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." *Diesel Props. S.r.l. v. Greystone Bus. Cred. II LLC*, 631 F.3d 42, 54 (2d Cir. 2011) (quoting *Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572 (2005)). Thus, "where a valid and enforceable contract governs the relevant subject matter of the parties' dispute, the contract — rather than principles of restitution — should determine the measure of a party's recovery for events arising from that subject matter." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co., N.A.*, 837 F.3d 146, 150 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1815 (Apr. 24, 2017); *Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 F. App'x 57, 59 (2d Cir. 2011) ("[W]hen a valid agreement governs the subject matter of a dispute between parties, claims arising from that dispute are contractual; attempts to repackage them as sounding in . . . unjust enrichment . . . are generally precluded, unless based on a duty independent of the contract."). This principle does not apply, however, "where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue." *Poplar Lane Farm*, 449 F. App'x at 59 (quoting *Am. Tel. & Util. Consultants v. Beth Israel Med. Ctr.*, 763 N.Y.S.2d 466, 466 (App. Div. 2003)).

Because, as discussed above, there is a bona fide dispute as to the existence of a contract between Plaintiff and Defendant, the Court denies Defendant's motion for summary judgment on its unjust enrichment claim. If Defendant proves the existence of a contract at trial, the Court will dismiss its unjust enrichment claim as a matter of law.

### III. Conclusion

For the foregoing reasons, the Court grants Defendant's motion for partial summary judgment in part as to Plaintiff's claims for the implied covenant of good faith and fair dealing (counts two and six), except to the extent they are based on Defendant's refusal to provide technical data for the MTA bid; and grants Defendant's motion for partial summary judgment as to Plaintiff's claims for promissory estoppel (count seven), equitable estoppel (count eight), fraud (count nine), tortious interference with contract and with prospective economic advantage (counts ten and eleven), and declaratory judgment (count twelve). In addition, the Court reserves judgment on count thirteen, for breach of the Waste Oil Agreement, and instructs Plaintiff to brief the issues explained above within ten days of the date of this Memorandum and Order, with Defendant's response due ten days thereafter. Finally, the Court denies Defendant's motion for summary judgment on Plaintiff's claims for breach of the exclusivity agreement (count one) and the implied exclusivity agreement (count five), as well as Defendant's motion for summary judgment on its counterclaims for breach of contract and unjust enrichment.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: August 8, 2017
      Brooklyn, New York